**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
CINCINNATI DIVISION**

| | |
|---|---|
| National Republican Senatorial Committee, National Republican Congressional Committee, James David Vance, Steven Joseph Chabot,<br><br>        *Plaintiffs*,<br><br>v.<br><br>Federal Election Commission, Allen J. Dickerson, in his official capacity as a Commissioner and the Chair of the Federal Election Commission, Dara Lindenbaum, in her official capacity as a Commissioner and the Vice Chair of the Federal Election Commission, and Shana M. Broussard, Sean J. Cooksey, James E. Trainor III, and Ellen L. Weintraub, each in their official capacity as a Commissioner of the Federal Election Commission,<br><br>        *Defendants*. | No. 1:22-cv-00639 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs National Republican Senatorial Committee (NRSC), National Republican Congressional Committee (NRCC), James David ("J.D.") Vance, and Steven ("Steve") Joseph Chabot, allege as follows:

### INTRODUCTION

1.      Plaintiffs, the Republican Party's national senatorial and congressional committees and two of their general election nominees for federal office, bring this action to protect the most fundamental of rights in our democratic form of government: "the right to participate in electing our political leaders." *McCutcheon v. FEC*, 572 U.S. 185, 191 (2014) (plurality opinion). Political

1

parties' expression of support for their candidates, particularly in the context of an election, is "core" First Amendment activity entitled to the most robust constitutional protection. *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 222 (1989). Yet the federal campaign finance laws severely restrict political party committees from doing what the First Amendment entitles them to do: fully associate with and advocate for their own candidates for federal office.

2.      The First Amendment commands that "Congress shall make no law . . . abridging the freedom of speech." But the Federal Election Campaign Act (FECA) abridges the political speech of party committees by strictly limiting how much of their own money they can spend to influence federal elections in cooperation—or "coordination"—with their candidates. In particular, section 315(d) of FECA, Pub. L. 94-283, 90 Stat. 475 (1976) (codified at 52 U.S.C. § 30116(d)), imposes severe limitations on how much money party committees can spend on such so-called "coordinated party expenditures" to support their general election nominees in addition to the minimal direct financial contributions allowed under FECA. 52 U.S.C. § 30116(d)(1)–(3); *see FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 443–45 (2001) (*Colorado II*); 11 C.F.R. § 109.20 (defining "coordinated"). The limits on coordinated party expenditures even restrict how much money party committees can cooperatively spend on their political advertising and other general public communications, which the FEC defines as "party coordinated communication[s]." 11 C.F.R. § 109.37.

3.      For the two major political parties, only the Republican National Committee and Democratic National Committee and individual state party committees have any authority to make coordinated party expenditures up to the limits under 52 U.S.C. § 30116(d). 52 U.S.C. § 30116(d)(1)–(3); *see* 11 C.F.R. § 109.32 ("What are the coordinated party expenditure limits?"). The national senatorial and congressional committees of the two major parties do not have separate

limits under 52 U.S.C. § 30116(d). 52 U.S.C. § 30116(d)(1)–(3). In fact, if the NRSC and NRCC want to make coordinated party expenditures in support of Republican senatorial or congressional nominees under 52 U.S.C. § 30116(d), the FEC requires that they first obtain permission from the Republican National Committee or the state party committee in the nominee's home state through an express assignment of coordinated spending authority, and then may only make such expenditures up to the applicable spending limit. *See* 11 C.F.R. § 109.33. Absent an assignment, the NRSC and NRCC cannot engage in coordinated party expenditures with their candidates at all, unless that spending falls within FECA's severely low limits on direct candidate contributions. 52 U.S.C. § 30116(a)(2)(A), (h).

4.     Congress imposes these limits on political party committee spending prophylactically; FECA's base contribution limits already strictly limit how much money any one donor may contribute to a particular candidate or party committee. *Id.* § 30116(a)(1).

5.     Congress's imposition of these prophylactic limits is selective speech rationing. Congress limits only some coordinated expenditures by party committees made for the purpose of influencing a federal election—namely, those rising above a certain monetary threshold that, in general, is tied to nothing but the voting-age population and cost of living in a given state. *See id.* § 30116(d)(2)–(3); 11 C.F.R. § 109.32(a)(2), (b)(2). Moreover, Congress expressly exempts certain coordinated payments that party committees may make to benefit their candidates, such as spending on mailed political advertisements disseminated using volunteers, 52 U.S.C. § 30101(8)(B)(ix), (9)(B)(viii), and payments related to recounts, contests, and other "legal proceedings," *id.* § 30116(a)(9), (d)(5).

6.     The harm to the core First Amendment-protected activities of political parties and their candidates flowing from FECA's limits on coordinated party expenditures is substantial.

"Not only do such limits inhibit party committees' ability to spend their money effectively, they also make grassroots organizing more difficult." Ian Vandewalker & Daniel I. Weiner, *Stronger Parties, Stronger Democracy: Rethinking Reform*, Brennan Center for Justice, at 14 (Sept. 16, 2015). And this harm has only grown starker in recent years as the rise of spending by Super PACs and other outside groups—which, unlike party committees, can engage in unlimited fundraising to influence voters—has diminished the parties' role in the political landscape. *Id.*

7.      Given the significant and unjustified burdens they place on core First Amendment activities, FECA's limits on coordinated expenditures by political party committees are unconstitutional and should have been scuttled long ago.

8.      In *Colorado II*, however, the Supreme Court upheld the limits on coordinated party expenditures on the incorrect premise that all coordinated expenditures by political party committees may be treated as the functional equivalent of "contributions" to candidates, as if they were no different from coordinated expenditures made by any other entity, and therefore could be restricted to prevent circumvention of FECA's base contribution limits. 533 U.S. at 464–65.

9.      *Colorado II* was wrongly decided and has since been undercut by changed factual circumstances and more recent Supreme Court decisions that undermine its anticircumvention rationale. Under the Supreme Court's intervening precedents, the severe burden inflicted on political parties by FECA's limits on coordinated party expenditures cannot survive any appropriate level of constitutional scrutiny.

10.      Accordingly, FECA's limits on political party coordinated expenditures should be held unconstitutional *in toto* or, at minimum, as applied to expenditures on party coordinated communications, as defined under 11 C.F.R. § 109.37. Plaintiffs thus bring this action for declaratory relief establishing that FECA's limits on coordinated party expenditures, including

4

those under 52 U.S.C. § 30116(d), violate the First Amendment, and for injunctive relief prohibiting enforcement of limits on coordinated party expenditures.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 2201, and 2202, as well as 52 U.S.C. § 30110, under which the question of the constitutionality of FECA's coordinated party expenditure limits, including those under 52 U.S.C. § 30116(d), should be immediately certified to the United States Court of Appeals for the Sixth Circuit for consideration en banc.

12.     Venue is proper in this Court under 52 U.S.C. § 30110 and 28 U.S.C. § 1391(e) because the Federal Election Commission is an entity of the United States; one or more Plaintiffs resides in this District; and Plaintiffs J.D. Vance and Steve Chabot are running federal campaigns in this District.

## PARTIES

13.     The NRSC is a national committee, as defined by 52 U.S.C. § 30101(14), and the Republican Party's senatorial campaign committee with its principal place of business at 425 2nd Street N.E., Washington, D.C. 20002.  The NRSC is the only national political party committee exclusively devoted to electing Republican candidates to the U.S. Senate from across the United States, including in Ohio.  Each election cycle, including in 2022, in addition to making direct contributions, the NRSC makes coordinated party expenditures in support of Republican nominees for the U.S. Senate across the country using coordinated spending authority assigned to it by the Republican National Committee or state party committees.  NRSC wants to make coordinated party expenditures to the maximum extent permissible under the U.S. Constitution.  To avoid a violation of coordinated party expenditure limits, each election cycle, the NRSC also incurs the

expense and inconvenience of establishing a segregated Independent Expenditure (IE) Unit to make independent expenditures in support of the Republican Party's nominees for the U.S. Senate.

14. The NRCC is a national committee, as defined by 52 U.S.C. § 30101(14), and the Republican Party's congressional campaign committee with its principal place of business at 320 First Street S.E., Washington, D.C. 20003. The NRCC is the only national political party committee exclusively devoted to electing Republican candidates to the U.S. House of Representatives from across the United States, including from Ohio's 16 congressional districts. Each election cycle, including in 2022, in addition to making direct contributions, the NRCC makes coordinated party expenditures in support of Republican nominees for the U.S. House of Representatives across the country using coordinated spending authority assigned to it by the Republican National Committee or state party committees. The NRCC wants to make coordinated party expenditures to the maximum extent permissible under the U.S. Constitution. To avoid a violation of coordinated party expenditure limits, each election cycle, the NRCC also incurs the expense and inconvenience of establishing a segregated IE Unit to make independent expenditures in support of the Republican Party's nominees for the U.S. House of Representatives.

15. James David ("J.D.") Vance is the 2022 Republican nominee for the U.S. Senate in Ohio and is eligible to vote in any election for the office of the President of the United States. In 2022, candidate Vance has participated in coordinated party expenditures, and he wants to do so to the maximum extent permissible under the U.S. Constitution.

16. Steven ("Steve") Joseph Chabot is the sitting U.S. Congressman and 2022 Republican nominee for the U.S. House of Representatives from Ohio's First Congressional District and is eligible to vote in any election for the office of the President of the United States.

In 2022, candidate Chabot has participated in coordinated party expenditures, and he wants to do so to the maximum extent permissible under the U.S. Constitution.

17. The Federal Election Commission ("FEC") was established by 52 U.S.C. § 30106 and is an independent federal agency headquartered in Washington, D.C. charged with administering and enforcing the provisions of FECA, including the provisions challenged in this action. The FEC has exclusive jurisdiction with respect to the civil enforcement of FECA.

18. Defendant Allen J. Dickerson is a Commissioner and the Chair of the FEC. As a Commissioner, he is responsible for administering and enforcing FECA. He is sued in his official capacity.

19. Defendant Dara Lindenbaum is a Commissioner and the Vice Chair of the FEC. As a Commissioner, she is responsible for administering and enforcing FECA. She is sued in her official capacity.

20. Defendant Shana M. Broussard is a Commissioner of the FEC. As a Commissioner, she is responsible for administering and enforcing FECA. She is sued in her official capacity.

21. Defendant Sean J. Cooksey is a Commissioner of the FEC. As a Commissioner, he is responsible for administering and enforcing FECA. He is sued in his official capacity.

22. Defendant James E. Trainor III is a Commissioner of the FEC. As a Commissioner, he is responsible for administering and enforcing FECA. He is sued in his official capacity.

23. Defendant Ellen L. Weintraub is a Commissioner of the FEC. As a Commissioner, she is responsible for administering and enforcing FECA. She is sued in her official capacity.

**STANDING**

24. Plaintiffs have standing to challenge the constitutionality of FECA's coordinated party expenditure limits, including those under 52 U.S.C. § 30116(d). The coordinated party

7

expenditure limits under FECA subject Plaintiffs to civil and criminal penalties for noncompliance, *see* 52 U.S.C. § 30109(d), and therefore prohibit Plaintiffs from engaging in coordinated party expenditures that they otherwise would engage in, including coordinated party expenditures above the statutory limits. Plaintiffs therefore are suffering injuries in fact that are fairly traceable to FECA's coordinated party expenditure limits, including those under 52 U.S.C. § 30116(d), and the Court can redress their injuries by declaring those limits unconstitutional and enjoining Defendants from enforcing them.

25. When "the plaintiff is himself an object of the action," "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992).

26. Coordinated party expenditure limits, including those under 52 U.S.C. § 30116(d), injure Plaintiffs. The limits cap both the amount of money a political party committee can spend in cooperation with its candidates and the amount of cooperative support a party's candidates can accept from the party committee.

27. In 2022 and beyond, in addition to direct contributions to candidates, the NRSC and NRCC each want to make coordinated party expenditures without advance permission to do so from other party committees and in amounts exceeding FECA's coordinated party expenditure limits in races for federal office across the country, including in Ohio; but they cannot do so because of FECA's coordinated party expenditure limits, including those under 52 U.S.C. § 30116(d).

28. The NRSC has contributed to J.D. Vance the maximum amount it may directly contribute to the general election campaign of a Senate candidate. 52 U.S.C. § 30116(h).

29.     Under 11 C.F.R. § 109.33, the NRSC has been assigned some, but not all, of the Republican National Committee's and Ohio Republican state party committee's authority to make coordinated party expenditures under 52 U.S.C. § 30116(d)(3) in connection with the 2022 general election for U.S. Senate in Ohio.  The NRSC has spent up to the maximum amount of coordinated party expenditure authority that has been assigned to it in support of J.D. Vance's 2022 general election campaign for the U.S. Senate.

30.     The NRSC wants to make additional coordinated expenditures in support of J.D. Vance's candidacy for the U.S. Senate that would be subject to and in excess of FECA's coordinated party expenditure limits, and candidate Vance wants to participate in such coordinated party expenditures with the NRSC.

31.     But for FECA's coordinated party expenditure limits, the NRSC would make additional coordinated expenditures in support of J.D. Vance's candidacy for the U.S. Senate, and candidate Vance would participate in such coordinated party expenditures.

32.     Because of FECA's coordinated party expenditure limits, as in past election cycles, the NRSC has again incurred the expense and inconvenience of creating a segregated IE Unit to make independent expenditures in support of 2022 Republican nominees for the U.S. Senate across the country.

33.     The IE Unit that the NRSC has been forced to create has caused it to waste time and resources.  For example, advertisements bought by the IE Unit cannot qualify for the lowest-unit rates on the purchase of television broadcasting time and the IE Unit rents separate office space and employs separate staff and vendors redundant to the NRSC's general operation.

34.     The NRCC has contributed to Steve Chabot the maximum amount a political party committee may directly contribute to the general election campaign of a U.S. House of Representatives candidate.  52 U.S.C. § 30116(a)(2)(A).

35.     Under 11 C.F.R. § 109.33, the NRCC has been assigned some, but not all, of the Republican National Committee's and Ohio Republican state party committee's authority to make coordinated party expenditures under 52 U.S.C. § 30116(d)(3) in connection with a 2022 general election for U.S. House of Representatives in Ohio.  The NRCC has spent up to the maximum amount of coordinated party expenditure authority that has been assigned to it in support of Steve Chabot's 2022 general election campaign for the U.S. House of Representatives.

36.     The NRCC wants to make additional coordinated expenditures in support of Steve Chabot's candidacy for the U.S. House of Representatives that would be subject to and in excess of FECA's coordinated party expenditure limits, and candidate Chabot wants to participate in such coordinated party expenditures with the NRCC.

37.     But for FECA's coordinated party expenditure limits, the NRCC would make additional coordinated expenditures in support of Steve Chabot's candidacy for the U.S. House of Representatives, and candidate Chabot would participate in such coordinated party expenditures.

38.     Because of FECA's coordinated party expenditure limits, as in past election cycles, the NRCC has again incurred the expense and inconvenience of creating a segregated IE Unit to make expenditures in support of 2022 Republican nominees for the U.S. House of Representatives across the country.

39.     The IE Unit that the NRCC has been forced to create has caused it to waste time and resources.  For example, advertisements bought by the IE Unit cannot qualify for the lowest-

10

unit rates on the purchase of television broadcasting time and the IE Unit rents office space and employs separate staff and vendors redundant to the NRCC's general operation.

40.    Absent the judicial relief requested in this lawsuit, the NRSC and NRCC face investigation and potential liability if they engage in the desired or intended core First Amendment activities described above in excess of FECA's coordinated party expenditure limits and thus are being chilled from engaging in those activities and exercising their First Amendment rights.

41.    Plaintiffs want to conduct substantially similar activity to that described above in the future, and there is a strong likelihood that the current situation and chilling effect will recur because of the recurring nature of elections; the continued existence, missions, and intended activities of Plaintiffs; and the recurrence of public and congressional debate on public issues.

42.    Absent the judicial relief requested in this lawsuit, Candidate Vance faces investigation and potential liability if he engages in the desired or intended core First Amendment activities described above in excess of FECA's coordinated party expenditure limits and thus is being chilled from engaging in those activities and exercising his First Amendment rights.

43.    At this time, in addition to his 2022 candidacy, Candidate Vance intends to run for federal office again in the future.  He wants to engage in core First Amendment activities in excess of FECA's coordinated party expenditure limits, including those under 52 U.S.C. § 30116(d), when he does so.

44.    Absent the judicial relief requested in this lawsuit, Candidate Chabot faces investigation and potential liability if he engages in the desired or intended core First Amendment activities described above in excess of FECA's coordinated party expenditure limits and thus is being chilled from engaging in those activities and exercising his First Amendment rights.

45. At this time, in addition to his 2022 candidacy, Candidate Chabot intends to run for federal office again in the future. He wants to engage in core First Amendment activities in excess of FECA's coordinated party expenditure limits, including those under 52 U.S.C. § 30116(d), when he does so.

46. The loss of First Amendment rights, however brief, results in irreparable harm, and there is no adequate alternative remedy at law to injunctive relief.

## LEGAL BACKGROUND

### Political Contributions and Expenditures Under FECA

47. FECA regulates federal political "contributions" and "expenditures."

48. FECA defines a "contribution" to include "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(8)(A)(i); *see* 11 C.F.R. § 100.52. Contributions thus may be made through either direct financial support to a candidate, campaign, or party committee or indirect in-kind payments for goods or services on behalf of a candidate, campaign, or party committee. *See, e.g.*, 11 C.F.R. § 100.52 ("[T]he term anything of value includes all in-kind contributions.").

49. FECA similarly defines an "expenditure" to include "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(9)(A)(i); *see* 11 C.F.R. § 100.111.

50. In the ordinary course, an "expenditure[] made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate" or his campaign is

deemed to be an in-kind contribution to such candidate. 52 U.S.C. § 30116(a)(7)(B)(i); *see* 11 C.F.R. § 109.20.

51.     Since *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court has treated limits on political contributions and expenditures differently under the First Amendment.  While *Buckley* recognized that "contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities," it concluded that each encroaches on protected First Amendment interests to a different degree. *Id.* at 14.

52.     Specifically, the Court subjected expenditure limits to "the exacting scrutiny applicable to limitations on core First Amendment rights of political expression" and held that such limits are constitutional only if they "promote[] a compelling interest and [are] the least restrictive means to further the articulated interest." *Id.* at 44–45; *McCutcheon*, 572 U.S. at 197.

53.     By contrast, the Court held that contribution limits are constitutional so long as the government "demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." *Buckley*, 424 U.S. at 25.

54.     Under *Buckley*, political expenditures cannot be limited, but FECA imposes strict limits on the amounts of monetary and in-kind contributions that may be lawfully made to federal candidates and political party committees by individuals, political committees, and other sources. *See generally* 52 U.S.C. § 30116 ("Limitations on contributions and expenditures").  FECA's statutory contribution limits are often referred to as "base limits." *McCutcheon*, 572 U.S. at 221 (plurality opinion).

55.     The base limit on individual contributions to a federal candidate currently stands at $2,900 per election for the 2021–2022 election cycle. 52 U.S.C. § 30116(a)(1)(A); *see* FEC, Contribution limits, https://bit.ly/3ID8W7N (last visited Nov. 3, 2022).

56. FECA also contains an earmarking rule that limits federal candidate contributions from individual donors. Under that rule, "all contributions made by a person . . . [that] are in any way earmarked or otherwise directed through an intermediary or conduit to such candidate, shall be treated as contributions from such person to such candidate." 52 U.S.C. § 30116(a)(8). FEC regulations further provide that "[a]ll contributions by a person made on behalf of or to a candidate, including contributions which are in any way earmarked or otherwise directed to the candidate through an intermediary or conduit, are contributions from the person to the candidate." 11 C.F.R. § 110.6(a).

57. The FEC has defined the term "earmarked" to mean a donor's "designation, instruction, or encumbrance, whether direct or indirect, express or implied, oral or written, which results in all or any part of a contribution or expenditure being made to, or expended on behalf of, a clearly identified candidate or a candidate's authorized committee." *Id.* § 110.6(b). "If, for example, a donor gives money to a party committee but directs the party committee to pass the contribution along to a particular candidate, then the transaction is treated as a contribution from the original donor to the specified candidate" and is subject to the candidate base limit (*i.e.*, $2,900). *McCutcheon*, 572 U.S. at 194 (plurality opinion).

**FECA's Limits on Party Committees: Direct Candidate Contributions, Coordinated Party Expenditure Limits, and Independent Expenditures**

58. Political party committees maintain a general operating bank account from which they can make contributions and expenditures "for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(8)(A)(i), (9)(A)(i). During the 2021–2022 election cycle, the base limit on individual donor contributions is $36,500 per year to the general operating accounts of the national party committees and $10,000 per year to the general operating accounts of any state, district, and local party committees. *See* FEC, Contribution limits, *supra*.

14

59.     Under FECA, political party committees have three primary options for providing financial support to federal candidates from their general operating accounts: (1) direct contributions, (2) coordinated party expenditures, and (3) independent expenditures.

60.     In general, FECA imposes a base $5,000 limit per election on direct or in-kind contributions from a political party committee to a federal candidate, 52 U.S.C. § 30116(a)(2)(A), while a national party committee and its senatorial campaign committee may contribute up to $51,200 combined per campaign to each candidate for the U.S. Senate in 2022, *id.* § 30116(h).

61.     In addition to the contribution limits, the national and state political party committees may also make limited amounts of coordinated expenditures in cooperation with their general election candidates. *Id.* § 30116(d)(1)–(3); 11 C.F.R. § 109.30 ("Political party committees may . . . make coordinated party expenditures in connection with the general election campaign of a candidate, subject to the limits and other provisions in this subpart."). Unlike direct contributions, title to money spent on coordinated expenditures remains with the party committee, not with the candidate, and the party committee, not the candidate, ultimately decides how and for what purpose the money will be spent.

62.     The coordinated party expenditure limits under 52 U.S.C. § 30116(d) are based on office sought, state, and voting-age population and are adjusted annually for inflation. In the 2022 election cycle, the limits for House nominees are $55,000 in states with more than one representative and $109,900 in states with only one representative; the limits for Senate nominees range from a low of $109,900 to a high of $3,348,500, depending on the state's voting-age population. *See* 11 C.F.R. § 109.32; *see also* FEC, Coordinated party expenditure limits, https://bit.ly/3DcUySP (last visited Nov. 3, 2022).

63.     FECA has been understood not to authorize any coordinated party expenditures by the senatorial or congressional campaign committees of the national party (*e.g.*, the NRSC or NRCC) in excess of the base contribution limits; however, by regulation, the national party or a state party committee may assign all or a portion of its coordinated spending authority to them. *See* 11 C.F.R. §109.33 ("The national committee of a political party and a State committee of a political party . . . may assign its authority to make coordinated party expenditures authorized by 11 CFR 109.32 to another political party committee.").

64.     In simple terms, the coordinated party expenditure limits under 52 U.S.C. § 30116(d) apply to any "expenditures" made by the party in "coordination" with a general election candidate.   FEC regulations define the term "coordinated" to mean "made in cooperation, consultation or concert with, or at the request or suggestion of, a candidate, a candidate's authorized committee, or a political party committee." *Id.* § 109.20(a).

65.     Traditionally, coordinated party expenditures under 52 U.S.C. § 30116(d) have primarily consisted of expenditures on so-called "party coordinated communication[s]." *See id.* § 109.37.

66.     In general, a party coordinated communication is any form of general public political advertising—including ads disseminated "by means of any broadcast, cable, or satellite communication, newspaper, magazine, outdoor advertising facility, mass mailing, or telephone bank to the general public," or "placed for a fee on another person's Web site," *id.* § 100.26—paid for by party committee and coordinated with a candidate or campaign that expressly advocates for the election or defeat of a clearly identified federal candidate. *Id.*  The term, however, also captures communications that may lack express advocacy, including coordinated communications made by the party that (i) simply republish campaign materials prepared by a candidate, the candidate's

16

authorized committee, or an agent of any of the foregoing or (ii) merely reference a candidate for President within 120 days of the general election or a candidate for the Senate or House within 90 days of the general election and which are disseminated in the candidate's jurisdiction. *Id.*

67. Yet Congress selectively and expressly permits political party committees to pay for certain advertising in full coordination with their general election nominees without limit. Under FECA, for example, if a state or local party committee produces a mass mailing that expressly advocates for the party's nominee, and that mailer is produced or delivered with a requisite level of volunteer involvement as defined by FEC regulation, then the costs of the mailer are deemed exempt from treatment as either contributions or expenditures, even if made in coordination with the supported candidate. 52 U.S.C. § 30101(8)(B)(ix), (9)(B)(viii). Absent this volunteer involvement, however, the same mail piece would be subject to FECA's contribution and coordinated party expenditure limits.

68. Moreover, a political party committee can avoid making party coordinated communications by engaging in *independent* expenditures, which are expenditures expressly advocating for the election or defeat of a federal candidate that are "not made in concert or cooperation with or at the request or suggestion of [any] candidate," campaign, or their agents. *See id.* § 30101(17); 11 C.F.R. § 100.16.

69. Traditionally, however, all party committee spending has been presumed coordinated with the party's supported candidate. *See, e.g.*, *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 28–29 n.1 (1981) ("Party committees are considered incapable of making 'independent' expenditures in connection with the campaigns of their party's candidates."); *see also* FEC Advisory Op. 1985-14 (DCCC), at 7 ("Party political committees are incapable of making independent expenditures.").

70.     Accordingly, to ensure the independence of their general election public advertising campaigns and therefore avoid making unintended party coordinated communications, the party committees have traditionally used "firewalls" to establish segregated IE Units to operate separately from the party's main operation, and therefore independently of any candidates.

71.     IE Units are expensive and redundant.  To ensure compliance with party coordinated expenditure limits, the party committee IE Unit must "rent and furnish an office, hire staff, and pay other administrative costs" that "duplicate many of the functions already being undertaken by other party offices." *Colorado II*, 533 U.S. at 470 (Thomas, J., dissenting).  And because IE Units cannot coordinate their activities with candidates, the public advertisements they pay for cannot qualify as candidate uses, and thus do not receive lowest-unit rates on the purchase of television broadcasting time. *FEC v. Colo. Republican Fed. Campaign Comm.*, 41 F. Supp. 2d 1197, 1210 (D. Colo. 1999).

72.     Moreover, in "[e]stablishing and maintaining independence," party committee IE Units "tend[] to create voter confusion and to undermine the candidate that the party sought to support." *Colorado II*, 533 U.S. at 470 (Thomas, J., dissenting).  Voters generally view candidates as intimately connected with their parties and do not understand or draw meaningful distinctions between advertisements that are made independent of a candidate or made in coordination with, and thus attributable to, a candidate.

**National Party Committee Accounts and Selective Coordinated Payment Limits**

73.     In 2014, Congress created three new types of segregated accounts for national party committees to raise and spend funds for specific designated purposes.  *See* Consolidated and Further Continuing Appropriations Act, Pub. L. No. 113-235, div. N, § 101, 128 Stat. 2130, 2772–73 (2014) (codified at 52 U.S.C. § 30116(a)(1)(B), (a)(9)).  The base limit on individual donor contributions to these accounts is currently $109,500, three times higher than the limit for

contributions to the national party committees' general accounts.  *See id.*; FEC, Contribution limits, *supra*.

74.     One of those new accounts is a "legal proceedings" account, which national party committees may establish to be "used to defray expenses incurred with respect to the preparation for and the conduct of election recounts and contests and other legal proceedings."  52 U.S.C. § 30116(a)(9)(C).

75.     Payments from the legal proceedings account may be made in full coordination with—*i.e.*, "cooperation, consultation or concert with, or at the request or suggestion of"— a candidate or campaign.  11 C.F.R. § 109.20(a).  And Congress expressly provided that party committee payments from the legal proceedings account are *not* subject to the coordinated party expenditure limits under 52 U.S.C. § 30116(d).  52 U.S.C. § 30116(d)(5).

76.     The legislative history of the act providing for this type of account suggests that a higher limit on contributions to the account is appropriate because payments from the account "are not for the purpose of influencing Federal elections."  160 Cong. Rec. S6814 (daily ed. Dec. 13, 2014) (statement of Senator Reid); 160 Cong. Rec. H9286 (daily ed. Dec. 11, 2014) (statement of Congressman Boehner).  But, in fact, spending on "election recounts and litigation" commonly has an "influence on elections"; after all, such efforts "resolve whether an actual candidate wins or loses a particular election."  *Libertarian Nat'l Comm., Inc. v. FEC*, 924 F.3d 533, 555 (D.C. Cir. 2019) (Griffith, J., concurring in part and dissenting in part).

### *Colorado I* and *II*

77.     In *Colorado Republican Federal Campaign Committee v. FEC*, 518 U.S. 604 (1996) (*Colorado I*), the Supreme Court held that FECA's limits on party expenditures under 52 U.S.C. § 30116(d) (formerly 2 U.S.C. § 441a(d)) were unconstitutional as applied to expenditures

made independently, without coordination with any federal candidate, reasoning that those limits failed the exacting scrutiny applicable to expenditure limits. *Id.* at 615–18. The Justices disagreed, however, whether to address the constitutionality of the limits with respect to coordinated party expenditure limits. *See, e.g.*, *id.* at 623–26; *id.* at 626–30 (Kennedy, J., concurring in the judgment and dissenting in part, joined by Chief Justice Rehnquist and Justice Scalia); *id.* at 631–48 (Thomas, J., concurring in the judgment and dissenting in part, joined by Chief Justice Rehnquist and Justice Scalia as to Parts I and III).

78.     In *Colorado II*, the Court considered the constitutionality of 52 U.S.C. § 30116(d)'s limits on coordinated party expenditures. In a five-to-four decision, the majority concluded that "party coordinated spending" is "the functional equivalent of contributions" and thus subject to the "closely drawn" test for contribution limits. 533 U.S. at 447, 456. The majority therefore addressed whether coordinated party expenditure limits were justified "on the theory that unlimited coordinated spending by a party raises the risk of corruption (and its appearance) through circumvention of valid contribution limits." *Id.* at 456.

79.     The *Colorado II* majority upheld coordinated party expenditure limits as a broad prophylactic measure to address the "corrosive effects" of money in politics, *id.* at 462, concluding that the government has a sufficiently important interest in preventing "corruption (and its appearance)," including through circumvention of the base contribution limits, to justify campaign finance restrictions. *Id.* at 456. In doing so, the majority adopted a broad notion of "corruption" encompassing not only "*quid pro quo* agreements, but also . . . undue influence on an officeholder's judgment," *id.* at 441, as well as "the corrupting influence of large contributions to candidates from individuals and nonparty groups," *id.* at 456 n.18.

80.     The *Colorado II* majority further rejected the claim "that unlimited coordinated spending is essential to the nature and functioning of parties," premised on the Court's acceptance of the idea that "'political parties are dominant players, second only to the candidates themselves, in federal elections.'" *Id.* at 450 (quoting Brief for Paul Allen Beck et al. as *Amici Curiae* at 5–6, *Colorado II*, 533 U.S. 431, (No. 00-191)).

81.     Four Justices dissented in *Colorado II*, rejecting the majority's rationale for upholding FECA's limits on coordinated party expenditures.  *See id.* at 465 (Thomas, J., dissenting, joined by Justice Scalia and Justice Kennedy in full and by Chief Justice Rehnquist as to Part II).  The dissenting Justices reasoned that limits on coordinated party expenditures should be subjected to "strict scrutiny," which the party expenditure limits under 52 U.S.C. § 30116(d) necessarily fail, because political speech "is the lifeblood of a self-governing people."  *Id.* at 465–66.  The dissenting justices explained that the rationale for the Court's prior distinction between contributions and expenditures (that contribution limits only marginally limit speech) should not extend to coordinated expenditures.  *See id.* at 466–67.  Indeed, "far from being a mere marginal restraint on speech," the dissenting Justices concluded, coordinated party expenditure limits "restrict[] the party's most natural form of communication; . . . preclude[] parties from effectively amplifying the voice of their adherents[;] and [have] had a stifling effect on the ability of the party to do what it exists to do."  *Id.* at 471 (internal quotation marks and citation omitted).  Moreover, even under the "closely drawn" standard applied by the *Colorado II* majority, the dissenting Justices determined both that FECA's coordinated party expenditure limits do not prevent corruption and that "there are better tailored alternatives for addressing . . . corruption," such as government enforcement of FECA's earmarking rule.  *Id.* at 481; *see id.* at 474–82.

**Subsequent Developments and Precedent Have Confirmed That *Colorado II* Was Wrongly Decided**

82.     Circumstances in the political "marketplace" have changed considerably since *Colorado II* and the rationales underlying the majority's reasoning have eroded.  In particular, the idea that "unlimited coordinated spending is essential to the nature and functioning of parties" that the *Colorado II* Court rejected, 533 U.S. at 450, has become more evident following the rise of Super PACs, whose ability to fundraise without limit has diminished the parties' dominance in the political landscape compared to 2001.  *See* Robert F. Baur, *The Parties' Struggles in the Political "Market": Can Regulation Solve This Problem—Should It, and if so, How?*, 54 Hous. L. Rev. 881, 899 (2017) ("[I]t is widely accepted [that the advent of Super PACs] has been damaging to the political parties, and some Super PACs are seen to be moving in the direction of assuming most of the functions of parties, including not only expensive on-air appeals but also the 'ground game' conducted to motivate voters to appear at the polls.").

83.     More important, since *Colorado II*, the Supreme Court has refined its campaign finance jurisprudence generally and the "closely drawn" test in particular.

84.     The Supreme Court has clarified that the only form of "corruption" Congress may address through the campaign finance laws is a "specific type of corruption—'*quid pro quo*' corruption."  *McCutcheon*, 572 U.S. at 207 (plurality opinion); *see FEC v. Cruz*, 142 S. Ct. 1638, 1652 (2022) ("This Court has recognized only one permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance."); *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 751 (2011) (emphasizing that the Court's campaign finance "case law is concerned" only with "*quid pro quo* corruption").

85.     By contrast, the Court has "denied attempts to reduce the amount of money in politics, to level electoral opportunities by equalizing candidate resources, and to limit the general

influence a contributor may have over an elected official." *Cruz*, 142 S. Ct. at 1652 (citations omitted). Congress similarly may not "target[] as corruption the general, broad-based support of a political party." *McCutcheon*, 572 U.S. at 225. "However well intentioned such proposals may be, the First Amendment . . . prohibits such attempts to tamper with the 'right of citizens to choose who shall govern them.'" *Cruz*, 142 S. Ct. at 1652 (quoting *McCutcheon*, 572 U.S. at 227 (plurality opinion)).

86.     The Supreme Court has also made clear that the "closely drawn" test triggers a "rigorous" review of campaign finance restrictions—one requiring "narrow[] tailor[ing]" to "achieve" the government's goal of preventing *quid pro quo* corruption. *McCutcheon*, 572 U.S. at 197, 199, 218 (plurality opinion). Or, as the Supreme Court put it recently, "[w]here exacting scrutiny applies, the challenged requirement must be narrowly tailored to the interest it promotes." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2384 (2021). For a law to survive this test, the government must demonstrate "its need for" that requirement "in light of any less intrusive alternatives." *Id.* at 2386.

87.     Courts must "be particularly diligent in scrutinizing the law's fit" when the law goes beyond FECA's base contribution limits and layers overlapping campaign finance restrictions "on top, ostensibly to prevent circumvention of the base limits," *McCutcheon*, 572 U.S. at 221, just as FECA's limits on coordinated party expenditures do.

88.     Indeed, "[s]uch a prophylaxis-upon-prophylaxis approach . . . is a significant indicator that the regulation may not be necessary for the interest it seeks to protect." *Cruz*, 142 S. Ct. at 1653 (citing *McCutcheon*, 572 U.S. at 221 (plurality opinion)); *see also Bennett*, 564 U.S. at 752 ("In the face of [the State's] contribution limits [and] strict disclosure requirements . . . it is

23

hard to imagine what marginal corruption deterrence could be generated by [an additional measure].").

89.     This intervening Supreme Court precedent makes clear that, by any standard, *Colorado II* is no longer good law and that limits on coordinated party expenditures are unconstitutional.

## CLAIMS FOR RELIEF

### Violation of the First Amendment
### Coordinated Party Expenditure Limits Violate the
### First Amendment to the U.S. Constitution

90.     Plaintiffs hereby reallege and incorporate by reference each of the foregoing allegations as if set forth herein.

91.     Plaintiffs challenge the constitutionality of limits on coordinated party expenditures, including those under 52 U.S.C. § 30116(d), which implicate political parties' fundamental First Amendment interests to participate in electing our political leaders and the corresponding right to associate with others in those activities.

92.     Prevention of *quid pro quo* corruption, or the appearance of such corruption, is the only constitutionally sufficient justification for contribution limits.  *Cruz*, 142 S. Ct. at 1652.

93.     The Supreme Court has made clear that "[c]ampaign finance restrictions that pursue other objects . . . impermissibly inject the Government 'into the debate over who should govern.' And those who govern should be the *last* people to help decide who *should* govern."  *McCutcheon*, 572 U.S. at 192 (emphasis in original) (citation omitted).

94.     Coordinated expenditures made by political party committees are not the functional equivalent of contributions and there is no evidence that coordinated expenditures by the political parties in excess of the limits on coordinated party expenditures set by Congress would give rise to *quid pro quo* corruption or its appearance.

95.     Limits on coordinated party expenditures do not survive constitutional scrutiny, whether strict scrutiny or the Supreme Court's "closely drawn" test is applied, because the limits do not further the permissible governmental interest in preventing *quid pro quo* corruption or its appearance and there is a substantial mismatch between the government's stated objective and the means selected to achieve it.

96.     More appropriately drawn or tailored alternatives to limits on coordinated party expenditures exist for combatting (nonexistent) *quid pro quo* corruption or its appearance.

97.     FECA's selective approach to regulating coordinated spending by political party committees further demonstrates that FECA's limits on coordinated party expenditures are not closely drawn or narrowly tailored to prevent (nonexistent) *quid pro quo* corruption or its appearance.

98.     No serious reliance interests in coordinated party expenditure limits are at stake because parties have been prevented from acting by (as opposed to having acted in conformance with) an existing legal rule.  *See Citizens United v. FEC*, 558 U.S. 310, 365 (2010).

99.     Because the government lacks a cognizable interest in restricting the expenditures of political parties and more appropriately tailored alternatives to coordinated party expenditure limits exist to prevent (nonexistent) *quid pro quo* corruption or its appearance, any coordinated party expenditure limits, including those under 52 U.S.C. § 30116(d), violate the First Amendment's guarantees of freedom of speech and freedom to associate with others.  U.S. Const. amend. I.

**Violation of the First Amendment**
**Coordinated Party Expenditures Limits Violate the**
**First Amendment to the U.S. Constitution**
**As Applied to Expenditures on Party Coordinated Communications**

100.    Plaintiffs hereby reallege and incorporate by reference each of the foregoing allegations as if set forth herein.

101.    Plaintiffs further challenge the constitutionality of the application of FECA's limits on coordinated party expenditures, including those under 52 U.S.C. § 30116(d), to expenditures made by political party committees on "party coordinated communication[s]" as defined under 11 C.F.R. § 109.37.

102.    The government lacks a cognizable interest in restricting party committee expenditures on party coordinated communications and more appropriately tailored alternatives to coordinated party expenditure limits exist to prevent (nonexistent) *quid pro quo* corruption or its appearance based on such expenditures.

103.    Accordingly, the application of limits on coordinated party expenditures, including those under 52 U.S.C. § 30116(d), to party coordinated communications violates the First Amendment's guarantees of freedom of speech and freedom to associate with others.  U.S. Const. amend. I.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully pray for the following relief:

a.    A declaratory judgment that any limits on political party coordinated expenditures, including those under 52 U.S.C. § 30116(d), violate the First Amendment to the United States Constitution, including as applied to party coordinated communications, and are therefore unenforceable;

b.   an order permanently enjoining the FEC, its officers, agents, servants, and employees from enforcing limits on political party coordinated expenditures, including those under 52 U.S.C. § 30116(d), against Plaintiffs and their intended activities;

c.   costs and attorney's fees pursuant to any applicable statute or authority; and

d.   any other relief the Court in its discretion deems just and appropriate.

November 4, 2022

Respectfully submitted,

/s/ Thomas Conerty

| | |
|---|---|
| Thomas Conerty | Noel J. Francisco* |
| Bar No. 101619 | Donald F. McGahn II* |
| JONES DAY | John M. Gore* |
| 325 John H. McConnell Boulevard | E. Stewart Crosland* |
| Suite 600 | Charles E.T. Roberts* |
| Columbus, OH 43215 | JONES DAY |
| Phone: (614) 469-3939 | 51 Louisiana Avenue, N.W. |
| Fax: (614) 461-198 | Washington, DC 20001 |
| tconerty@jonesday.com | Phone: (202) 879-3939 |
| | Fax: (202) 626-1700 |
| *Counsel for Plaintiffs* | njfrancisco@jonesday.com |
| | dmcgahn@jonesday.com |
| | jmgore@jonesday.com |
| Jessica Furst Johnson* | scrosland@jonesday.com |
| Chris Winkelman* | cetroberts@jonesday.com |
| HOLTZMAN VOGEL BARAN | |
| TORCHINSKY & JOSEFIAK PLLC | *Counsel for Plaintiffs* |
| 2300 N Street, N.W. | |
| Suite 643A | *Pro hac vice* applications forthcoming |
| Washington, DC 20037 | |
| Phone: (202) 737-8808 | |
| Fax: (540) 341-8809 | |
| jessica@holtzmanvogel.com | |
| cwinkelman@holtzmanvogel.com | |

*Counsel for National Republican Senatorial Committee & National Republican Congressional Committee*

*Pro hac vice* applications forthcoming