**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**CINCINNATI DIVISION**

| | |
|---|---|
| NATIONAL REPUBLICAN SENATORIAL COMMITTEE, *et al.*, | |
| *Plaintiffs*, | No. 1:22-cv-639 |
| v. | Hon. Douglas R. Cole |
| FEDERAL ELECTION COMMISSION, *et al.*, | |
| *Defendant.* | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO CERTIFY**
**QUESTION TO THE EN BANC COURT OF APPEALS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ...................................................................................................... 1

BACKGROUND ....................................................................................................... 7

    A.    Legal Framework ......................................................................... 7

        1.    FECA's Restrictions On Political Parties' Political Speech ............................. 7

            a.    Contribution Limits And Reporting Requirements.................................... 8

            b.    Coordinated Party Expenditure Limits On Political Speech..................... 9

            c.    Congress's Selective Exclusion Of Certain Coordinated Spending From The Coordinated Party Expenditure Limits .................. 11

            d.    The Burdens On Parties Making Independent Party Expenditures To Influence Federal Elections .......................................... 12

        2.    Supreme Court Decisions ......................................................... 14

    B.    This Case ...................................................................................... 16

SUMMARY OF THE ARGUMENT ........................................................................... 18

ARGUMENT ............................................................................................................ 19

I.    THE COORDINATED PARTY EXPENDITURE LIMITS VIOLATE THE FIRST AMENDMENT ....................................................................... 19

    A.    The Coordinated Party Expenditure Limits Do Not Prevent *Quid Pro Quo* Corruption ....................................................................... 20

    B.    Even If The Coordinated Party Expenditure Limits Actually Prevented *Quid Pro Quo* Corruption, They Are Not Closely Drawn Means Of Doing So.......................................................... 25

II.    *COLORADO II* DOES NOT PRECLUDE CERTIFICATION ......................................... 27

    A.    *Colorado II* Does Not Control ..................................................... 27

    B.    *Colorado II* Should Be Overruled.............................................. 30

CONCLUSION........................................................................................................... 38

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ams. for Prosperity Found. v. Bonta*,
 141 S. Ct. 2373 (2021) ............................................................................25, 26, 27

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*,
 564 U.S. 721 (2011) ..............................................................................................19

*Bread Pol. Action Comm. v. FEC*,
 455 U.S. 577 (1982) ..............................................................................................19

*Buckley v. Valeo*,
 424 U.S. 1 (1976) (per curiam) ...................................................................... *passim*

*Cal. Democratic Party v. Jones*,
 530 U.S. 567 (2000) .................................................................................................1

*Cal. Med. Ass'n v. FEC*,
 453 U.S. 182 (1981) ..............................................................................................19

*Citizens United v. FEC*,
 558 U.S. 310 (2010) ........................................................................................ *passim*

*Colo. Republican Fed. Campaign Comm. v. FEC*,
 518 U.S. 604 (1996) ........................................................................................ *passim*

*Davis v. FEC*,
 554 U.S. 724 (2008) ..............................................................................................25

*Eu v. S.F. Cnty. Democratic Cent. Comm.*,
 489 U.S. 214 (1989) ..................................................................................1, 31, 33

*FEC v. Colo. Republican Fed. Campaign Comm.*,
 213 F.3d 1221 (10th Cir. 2000) ...........................................................................26

*FEC v. Colo. Republican Fed. Campaign Comm.*,
 533 U.S. 431 (2001) ........................................................................................ *passim*

*FEC v. Cruz*,
 142 S. Ct. 1638 (2022) .................................................................................... *passim*

*Holmes v. FEC*,
 823 F.3d 69 (D.C. Cir. 2016) ..............................................................4, 6, 19, 30

*Holmes v. FEC*,
 875 F.3d 1153 (D.C. Cir. 2017) (en banc) ...........................................................21

*Janus v. AFSCME*,
 138 S. Ct. 2448 (2018) .................................................................................... *passim*

*Jones v. Jegley*,
 947 F.3d 1100 (8th Cir. 2020) ........................................................................21, 27

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Libertarian Nat'l Comm., Inc. v. FEC*,
   924 F.3d 533 (D.C. Cir. 2019) (en banc) ........................................................................5, 28

*McCutcheon v. FEC*,
   572 U.S. 185 (2014) ......................................................................................... *passim*

*Monitor Patriot Co. v. Roy*,
   401 U.S. 265 (1971) ...............................................................................................19

*Republican Party of Minn. v. White*,
   536 U.S. 765 (2002) ...............................................................................................24

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984) .................................................................................................1

*Williams-Yulee v. Fla. Bar*,
   575 U.S. 433 (2015) ...............................................................................................24

*Zimmerman v. City of Austin*,
   881 F.3d 378 (5th Cir. 2018) ...............................................................................21, 27

S**TATUTES**

52 U.S.C. § 30101 .................................................................................................... *passim*

52 U.S.C. § 30102 .......................................................................................................8, 9

52 U.S.C. § 30104 ..........................................................................................................9

52 U.S.C. § 30110 .................................................................................................... *passim*

52 U.S.C. § 30116 .................................................................................................... *passim*

52 U.S.C. § 30125 ..........................................................................................................7

Consolidated and Further Continuing Appropriations Act, 2015,
   Pub. L. No. 113-235, 128 Stat. 2130 (2014) ....................................................................12

Ala. Code § 17-5-15 .......................................................................................................24

Ariz. Rev. Stat. § 16-911 ................................................................................................24

Ariz. Rev. Stat. § 16-912 ................................................................................................24

Ariz. Rev. Stat. § 16-915 ................................................................................................24

Cal. Gov't Code § 85301 ................................................................................................24

Cal. Gov't Code § 85400 ................................................................................................24

10 Ill. Comp. Stat. 5/9-8.5 ..............................................................................................24

Ind. Code § 3-9-2-1 *et seq.* ...........................................................................................24

Iowa Code § 68A.101 *et seq.* .........................................................................................24

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Kan. Stat. § 25-4153 ........................................................................................24

Ky. Rev. Stat. § 121.150 ..................................................................................24

La. Stat. § 18:1505.2 ........................................................................................24

Miss. Code § 23-15-1021 ................................................................................24

N.C. Gen. Stat. § 163-278.13 ..........................................................................24

N.D. Cent. Code § 16.1-08.1-01 *et seq.* .......................................................24

N.J. Stat. § 19:44A-29 .....................................................................................24

N.M. Stat. § 1-19-34.7 .....................................................................................24

N.Y. Elec. Law § 14-114 ..................................................................................24

Neb. Rev. Stat. ch. 32, art. 16 .........................................................................24

Ohio Rev. Code § 3517.102 .............................................................................24

Or. Rev. Stat. § 260.005 *et seq.* .....................................................................24

25 Pa. Cons. Stat. § 3241 *et seq.* ...................................................................24

S.D. Codified Laws § 12-27-7 .........................................................................24

S.D. Codified Laws § 12-28-8 .........................................................................24

Tex. Elec. Code § 253.001 *et seq.* .................................................................24

Utah Code § 20A-11-101 *et seq.* ...................................................................24

Va. Code § 24.2-945 ........................................................................................24

Vt. Stat. tit. 17, § 2941 ....................................................................................24

W. Va. Code § 3-8-5c .......................................................................................24

Wis. Stat. § 11.1101 .........................................................................................24

Wis. Stat. § 11.1104 .........................................................................................24

Wyo. Stat. § 22-25-102 ....................................................................................24

## OTHER AUTHORITIES

Robert F. Bauer, *The Parties' Struggles in the Political "Market":*
   *Can Regulation Solve This Problem—Should It, and If So, How?,*
   54 Hous. L. Rev. 881 (2017)..............................................................6, 13, 36

11 C.F.R. § 100.89 ...........................................................................................12

11 C.F.R. § 109.20 ........................................................................................1, 10

11 C.F.R. § 109.21 ...........................................................................................13

11 C.F.R. § 100.26 ...........................................................................................11

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

11 C.F.R. § 109.32 ...................................................................................................11

11 C.F.R. § 109.33 .....................................................................................................2

11 C.F.R. § 109.37 ............................................................................................. *passim*

11 C.F.R. § 110.6 .......................................................................................................9

FEC, *Contribution Limits* ....................................................................................8, 9

FEC, *Coordinated Party Expenditure Limits* ..........................................................11

Richard L. Hasen, Buckley *Is Dead, Long Live* Buckley*: The New Campaign
    Finance Incoherence of* McConnell v. Federal Election Commission,
    153 U. Pa. L. Rev. 31 (2004) ...............................................................................30

Samuel Issacharoff, *Democracy's Deficits*,
    85 U. Chi. L. Rev. 485 (2018) .............................................................................37

Samuel Issacharoff, *Outsourcing Politics: The Hostile Takeover of Our
    Hollowed-Out Political Parties*, 54 Hous. L. Rev. 845 (2017) ..................31, 36, 37

Gary C. Jacobson & Jamie L. Carlson, *Politics of Congressional Elections*
    (9th ed. 2016) .....................................................................................................10

970 Mass. Code Regs. 1.04 .......................................................................................24

N.J. Admin. Code § 19:25-11.2 .................................................................................24

Richard H. Pildes, *Romanticizing Democracy, Political Fragmentation,
    and the Decline of American Government*, 124 Yale L.J. 804 (2014)....................37

Gerald F. Seib, *For Saner Politics, Try Stronger Parties*,
    Wall St. J. (Apr. 20, 2023) ...............................................................................6, 36

## INTRODUCTION

The National Republican Senatorial Committee (NRSC) and National Republican Congressional Committee (NRCC), two national committees of the Republican Party, along with Senator J.D. Vance and former Congressman Steve Chabot, have brought this case to safeguard the most "basic" right "in our democracy"—"the right to participate in electing our political leaders." *McCutcheon v. FEC*, 572 U.S. 185, 191 (2014) (plurality opinion).

Political parties' expression of support for their candidates, particularly in the context of elections, lies "at the core of our … First Amendment freedoms" and is entitled to the most robust constitutional protection. *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 222-23 (1989). It is undeniable that "the First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office," *id.* at 223, and that "implicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others" in those activities, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Indeed, "[r]epresentative democracy in any populous unit of governance is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000). But under the Federal Election Campaign Act of 1971 (FECA or the Act), Congress restricts political parties from doing what the First Amendment entitles them to do: fully associate with and support their own nominees for federal office.

Specifically, among Congress's improper efforts to "reduc[e] what it saw as wasteful and excessive campaign spending," *Colo. Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 618 (1996) (*Colorado I*) (plurality opinion), FECA strictly limits how much of their own money political party committees can spend in cooperation, or "coordination," with their general election candidates to influence federal elections, 52 U.S.C. § 30116(d)(1)-(3); *see* 11 C.F.R. § 109.20

1

(defining "coordinated"). These monetary limits on so-called "coordinated party expenditures"—which, in general, are tied to nothing but the voting-age population and cost of living in a given state—inhibit broad swaths of the parties' core political speech and associational activities, particularly their ability to work cooperatively with their nominees.

And FECA's assault on First Amendment freedoms does not end there: The Act actually *strips* some party committees—including the NRSC and the NRCC (and their Democratic counterparts)—of the right to make their own "coordinated party expenditures" in support of their party's nominees beyond the minimal direct contributions otherwise allowed. Indeed, the NRSC and the NRCC cannot engage in coordinated party expenditures with Republican nominees for the Senate or House *at all*, unless they first obtain express permission from the Republican National Committee or the state party committee in a nominee's home state to spend pursuant to *that* committee's limit. *See* 11 C.F.R. § 109.33.

In addition to being severe, Congress's imposition of these burdens on political party speech and association is selective. These limits apply to certain coordinated party spending made for the purpose of "influencing any election for Federal office," 52 U.S.C. § 30101(9)(A)(i), such as coordinated party political advertising, which the FEC defines as "party coordinated communication[s]," *id.* § 30116(d), (h); 11 C.F.R. § 109.37. But Congress has exempted from the limits other coordinated spending made for the purpose of influencing federal elections. This includes certain party committee payments on general election campaign mailers and other get-out-the vote efforts for nominees involving the party's use of volunteers, 52 U.S.C. § 30101(8)(B)(ix), (xi), (9)(B)(viii), (ix), as well as national party committees' payments for any "legal proceedings" involving federal candidates, *id.* § 30116(a)(9).

Congress's limits on coordinated party expenditures are also redundant. FECA already imposes contribution limits—so-called "base limits"—that strictly limit how much money any one donor may contribute to a party committee or federal candidate. *Id.* § 30116(a)(1); *see McCutcheon*, 572 U.S. at 192 (plurality opinion). The Act also prevents circumvention of these base limits through its "earmarking rule," which treats any funds directed by a donor toward a federal candidate through an intermediary as the donor's direct contribution to the candidate, subject to that donor's base limit. 52 U.S.C. § 30116(a)(8); *see McCutcheon*, 572 U.S. at 194 (plurality opinion). And FECA imposes strict requirements on party and candidate committees to disclose their receipts and disbursements of funds regularly, including special reporting of any funds earmarked toward a specific candidate. The FEC now promptly makes all of those disclosures available to the world online, at https://www.fec.gov.

All funds raised and spent by a party committee for the purpose of influencing federal elections must comply with the base limits, earmarking rule, and disclosure requirements. Congress's imposition of the coordinated party expenditure limits as "an additional measure" on top of those rules thus reflects a "prophylaxis-upon-prophylaxis approach" to campaign-finance restrictions—"a significant indicator" that these limits are unconstitutional. *FEC v. Cruz*, 142 S. Ct. 1638, 1652-53 (2022); *see McCutcheon*, 572 U.S. at 221 (plurality opinion) (similar). The government "bears the burden of proving the constitutionality of" the severe, selective, and redundant coordinated party expenditure limits, *McCutcheon*, 572 U.S. at 210 (plurality opinion), and it cannot do so. To the contrary, Congress's selective speech rationing flunks any applicable level of First Amendment scrutiny.

Fortunately, FECA provides a mechanism to redress this constitutional violation quickly. The Act directs that this Court "immediately shall certify all questions of constitutionality of this

Act" to appropriate Court of Appeals sitting en banc. 52 U.S.C. § 30110. This Court should therefore certify the following question to the en banc Sixth Circuit:

> Whether the limits on coordinated party expenditures in 52 U.S.C. § 30116 violate the First Amendment, either on their face or as applied to party spending in connection with "party coordinated communications" as defined in 11 C.F.R. § 109.37.

The en banc Sixth Circuit, in turn, should hold that these limits violate the First Amendment.

This Court should grant certification—and the Sixth Circuit should hold that FECA's coordinated party expenditure limits are unconstitutional—even though a 5-4 Supreme Court upheld the limits as they stood in 2001 in *FEC v. Colorado Republican Federal Campaign Committee*, 533 U.S. 431 (2001) (*Colorado II*). So long as this Court concludes that the question presented is not "wholly insubstantial, obviously frivolous, and obviously without merit"—quite "a low bar"—the Court should "accelerat[e] potential Supreme Court review" using FECA's certification provision. *Holmes v. FEC*, 823 F.3d 69, 71-74 (D.C. Cir. 2016) (cleaned up). And here, the question presented is far from frivolous. Under FECA as it stands today and current Supreme Court precedent, the coordinated party expenditure limits fail even the "closely drawn" test, the least demanding test applied to campaign-finance restrictions. Moreover, *Colorado II* does not even control this challenge, much less render it frivolous for purposes of § 30110.

*First*, *Colorado II* "does not control here" both because FECA's coordinated party expenditure limits now "operate against a distinct legal backdrop" that did not exist 22 years ago and because this "challenge raises distinct legal arguments that [*Colorado II*] did not consider." *McCutcheon*, 572 U.S. at 200-02 (plurality opinion). Since *Colorado II*, Congress has enacted a variety of exemptions to the coordinated party expenditure limits, including for payments on recounts, contests, and litigation. 52 U.S.C. § 30116(a)(9). Congress's selective imposition of the coordinated party expenditure limits upon a disfavored subset of political and campaign related-

speech only underscores the First Amendment problem. This case thus presents "a different statutory regime" than the one *Colorado II* Court confronted and therefore merits "plenary consideration." *McCutcheon*, 572 U.S. at 200 (plurality opinion); *see Libertarian Nat'l Comm., Inc. v. FEC*, 924 F.3d 533, 546 (D.C. Cir. 2019) (*LNC*) (en banc) (considering argument certified under § 30110 that in light of § 30116(a)(9), "[w]hat was constitutional before … is constitutional no longer").

In addition, this challenge presents "different legal arguments, at a different point in the development of campaign finance regulation." *McCutcheon*, 572 U.S. at 203 (plurality opinion). For example, in *Colorado II*, the challenger's brief did not even mention the phrase "*quid pro quo* corruption," but instead engaged with the FEC's argument, embraced by the *Colorado II* majority, that preventing "undue influence on an officeholder's judgment" was a sufficiently weighty interest to justify campaign-finance restrictions, 533 U.S. at 441, 465. But the Supreme Court has since made clear that this interest in "limit[ing] the general influence a contributor may have over an elected official" *cannot* support such restrictions. *Cruz*, 142 S. Ct. at 1652. Instead, it has held that there is "only one permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance." *Id.*; *accord McCutcheon*, 572 U.S. at 192, 207 (plurality opinion). The *Colorado II* majority sidestepped the question whether the coordinated party expenditure limits can be justified as preventing *quid pro quo* corruption, *see* 533 U.S. at 456 n.18, perhaps because the government "presented no evidence at all of corruption or the perception of corruption" in that case, *id.* at 475 (Thomas, J., dissenting). That issue is squarely presented here.

The challenger in *Colorado II* likewise did not contend that the coordinated party expenditure limits failed the "closely drawn" test for a lack of narrow tailoring. The *Colorado II* majority too never used the phrase "narrowly tailored" and upheld the coordinated party

5

expenditure limits even though "better tailored" alternatives to pursue the purported interest were available. *Id.* at 462 (majority opinion). Since then, however, the Supreme Court has clarified that even the closely drawn test requires "narrow[] tailor[ing]" of campaign-finance restrictions to "achieve" the sole permissible goal of preventing *quid pro quo* corruption. *McCutcheon*, 572 U.S. at 218 (plurality opinion). It also has made clear that the base limits, earmarking rule, and disclosure requirements "are themselves prophylactic measures" that both prevent *quid pro quo* corruption and cast doubt on the constitutionality of any "prophylaxis-upon-prophylaxis approach" through which Congress piles even more restrictions upon political speech and association—yet another issue that *Colorado II* did not address. *Cruz*, 142 S. Ct. at 1652-53.

*Second*, even if *Colorado II* controlled this case, that would not preclude certification. To the contrary, certification is required so long as there is "a non-frivolous argument in favor of overturning that precedent." *Holmes*, 823 F.3d at 74. And here, the grounds for overruling *Colorado II* are far from frivolous. *Colorado II* was grievously wrong the day it was decided, and developments in the 22 years since then have only further gutted its foundations. For example, in addition to the statutory changes discussed above, the *Colorado II* majority's assumption that "political parties are dominant players, second only to the candidates themselves, in federal elections," 533 U.S. at 450, is belied today, when "Super PACS are … moving in the direction of assuming most of the functions of parties," Robert F. Bauer, *The Parties' Struggles in the Political "Market": Can Regulation Solve This Problem—Should It, and If So, How?*, 54 Hous. L. Rev. 881, 899 (2017); *see, e.g.*, Gerald F. Seib, *For Saner Politics, Try Stronger Parties*, Wall St. J. (Apr. 20, 2023), https://on.wsj.com/3o2DWKc ("Donna Brazile, a former Democratic national chairwoman, says that 'over the years, the parties have been weakened by the new landscape where super PACs … have a stranglehold.'"). Nor has *Colorado II* produced any legitimate "reliance

interests." *Citizens United v. FEC*, 558 U.S. 310, 365 (2010). Especially given that "*stare decisis* applies with perhaps least force of all to decisions that wrongly denied First Amendment rights," *Janus v. AFSCME*, 138 S. Ct. 2448, 2478 (2018), to the extent that *Colorado II* governs this case, now is the time for the Supreme Court to reconsider *Colorado II.* Certification is necessary to facilitate that review. For all of these reasons, the Court should certify the crucial constitutional question presented in this case to the en banc Sixth Circuit.

## BACKGROUND

**A.     Legal Framework**

**1.     FECA's Restrictions On Political Parties' Political Speech**

Every dollar that a political party committee receives for the purpose of influencing an election for federal office is a "contribution" and must be collected in compliance with FECA's contribution limits and prohibitions—including the earmarking rule—and publicly reported to the FEC. 52 U.S.C. § 30101(8)(A)(i), (9)(A)(i); *id.* § 30116(a)(8). In fact, since Congress amended FECA through the Bipartisan Campaign Reform Act of 2002 (BCRA), national party committees have been banned from raising (or spending) any so-called "soft money" that is not subject to FECA's "limitations, prohibitions, and reporting requirements," *id.* § 30125(a), and state and local parties have been prohibited from using any funds not subject to such restrictions in connection with any "federal election activity," *id.* § 30125(b).

FECA's regulation of party committees' political speech does not end there. The Act also restricts how party committees can spend the limited contributions they raise to support their own candidates in federal elections. FECA provides party committees with three principal options for spending their money to provide financial support to their federal candidates: (i) contributions, (ii) coordinated party expenditures, and (iii) "independent expenditures." And it imposes strict dollar limitations on the first two categories.

### a.    Contribution Limits And Reporting Requirements

Under FECA, political party committees must maintain a general operating bank account from which they can make any contributions or expenditures "for the purpose of influencing any election for Federal office." 52 U.S.C. § 30102(h); *see id.* § 30101(8)(A)(i) (defining "contribution"), (9)(A)(i) (defining "expenditure"). The Act imposes various dollar limits on contributions made to or from these general operating accounts. *Id.* § 30116(a).

On the front end, FECA restricts how much money party committees can *receive* in their general operating accounts, by imposing base contribution limits on the amounts individuals and other political committees can contribute to them. For the 2023-2024 election cycle, the base limit on individual contributions is $41,300 per year to the general operating accounts of the national party committees and $10,000 per year to the general operating accounts of any state, district, and local party committees. *Id.* § 30116(a)(1)(B), (a)(2)(B); FEC, *Contribution Limits*, https://bit.ly/3JKuNNk (last visited May 16, 2023).

On the back end, FECA caps how much the party committees can *give* to any federal candidate or campaign, through a $5,000 base limit per election. 52 U.S.C. § 30116(a)(2)(A).[1] The Act similarly imposes base limits on contributions from individuals and other political committees to federal candidates and their campaigns, which are adjusted annually for inflation. *Id.* § 30116(c). For individuals, the base limit currently stands at $3,300 per election for the 2023-2024 election cycle. *Id.* § 30116(a)(1)(A); *see Contribution Limits*, *supra*.

To prevent evasion of the base contribution limits on direct candidate support, Congress has imposed the earmarking rule, which applies the base limits to funds that are "in any way earmarked or otherwise directed through an intermediary or conduit" to a federal candidate. 52

---

[1] A national party committee and its senatorial committee, however, may together contribute up to $57,800 to a senatorial candidate's campaign. 52 U.S.C. § 30116(h); *Contribution Limits*, *supra*.

U.S.C. § 30116(a)(8); *see* 11 C.F.R. § 110.6 (defining "earmarked"). Under FECA, earmarked contributions "shall be treated as contributions from [the earmarking] person to such candidate," 52 U.S.C. § 30116(a)(8), and thus count against that donor's contribution limit to the candidate. So, if "a donor gives money to a party committee but directs the party committee to pass the contribution along to a particular candidate, then the transaction is treated as a contribution from the original donor to the specified candidate," and governed by the $3,300 base limit for donor contributions. *McCutcheon*, 572 U.S. at 194 (plurality opinion); *see Contribution Limits*, *supra*.

FECA and FEC regulations also impose substantial public-disclosure requirements on party committees and candidates. These rules demand the periodic reporting of all receipts and disbursements, including detailed itemization of certain transactions, 52 U.S.C. § 30104(b), such as contributions aggregating more than $200 received from any one individual by a party committee in a calendar year or a candidate campaign in an election cycle, *id.* § 30104(b)(3). These rules further require special disclosure of contributions earmarked by a donor to a federal candidate through an intermediary. *Id.* § 30102(b); 11 C.F.R. § 110.6(c). Specifically, "[t]he intermediary or conduit of the earmarked contribution shall report the original source and the recipient candidate or authorized committee to the Commission and to the recipient candidate or authorized committee." 11 C.F.R. § 110.6(c)(1)(i). The recipient candidate's committee, moreover, must disclose on its report to the FEC its receipt of any earmarked contribution and, in certain cases, the identity of the intermediary that forwarded the earmarked contribution. *Id.* § 110.6(c)(2). All of these disclosures are publicly available on the FEC's website.

### b.    Coordinated Party Expenditure Limits On Political Speech

On top of the base contribution limits, earmarking rule, and disclosure requirements, FECA also imposes limits on what political parties can spend in coordination with their candidates. In

particular, FECA restricts the ability of political party committees to make any "expenditure[s]"—defined as "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office," 52 U.S.C. § 30101(9)(A)(i)—"coordinated" with their chosen candidates in connection with the general election, *id.* § 30116(d). The FEC has construed "coordinated" to mean "made in cooperation, consultation or concert with, or at the request or suggestion of, a candidate, a candidate's authorized committee, or a political party committee." 11 C.F.R. § 109.20(a).

Coordinated party expenditures subject to § 30116 include, and traditionally have consisted primarily of, expenditures in connection with so-called "party coordinated communication[s]," as now defined by the FEC at 11 C.F.R. § 109.37. *See* Gary C. Jacobson & Jamie L. Carlson, *Politics of Congressional Elections* 98 (9th ed. 2016) ("Coordinated party expenditures can be made for almost any campaign activity …. The party committees typically foot the bill for conducting polls, producing campaign ads, and buying broadcast media time—major expenses in areas where technical expertise is essential."); Exhibit A – Declaration of Jason Thielman in Support of Motion to Certify (Thielman Decl.) ¶¶ 14-15 (Doc. 19-1, PageID##177-178); Exhibit B – Declaration of Christopher Winkelman in Support of Motion to Certify (Winkelman Decl.) ¶¶ 14, 16 (Doc. 19-2, PageID##187-188); Exhibit C – Declaration of J.D. Vance in Support of Motion to Certify (Vance Decl.) ¶ 9 (Doc. 19-3, PageID#196). In general, a party coordinated communication is any form of general public political advertising—including ads disseminated "by means of any broadcast, cable, or satellite communication, newspaper, magazine, outdoor advertising facility, mass mailing, or telephone bank to the general public," or "placed for a fee on another person's website"—paid for by a party committee and coordinated with a candidate or campaign that expressly advocates the election or defeat of a clearly identified federal candidate. 11 C.F.R.

§ 109.37(a)(2)(ii); *id.* § 100.26 (defining "[p]ublic communication"). Yet the term also captures party communications that may lack express advocacy, including coordinated party advertising that (1) simply republishes campaign materials prepared by a candidate or campaign or (2) merely references a candidate within certain timeframes before the general election. *Id.* § 109.37(a)(2)(i), (iii).

For presidential, Senate, and House races in states with only one representative, Congress has set the coordinated party expenditure limits according to a formula that multiplies by two cents the voting age population of the United States or the State, depending on the federal office involved. 52 U.S.C. § 30116(d)(2)-(3). The exact amounts under this formula are updated annually by the FEC. In states with more than one representative, Congress has set a coordinated party expenditure limit of $10,000, which is also increased annually based on the Cost-of-Living Adjustment. *Id.* § 30116(d)(3)(B). Congress's restriction of coordinated party expenditures thus turns on the office sought, the state where the election will occur, the voting-age population, and inflation. *See id.* For 2023, the limits range from $118,700 to $3,623,400 for Senate candidates, and from $59,400 to $118,700 for House candidates. 11 C.F.R. § 109.32; FEC, *Coordinated Party Expenditure Limits*, https://bit.ly/3DcUySP (last visited May 16, 2023).

### c.    Congress's Selective Exclusion Of Certain Coordinated Spending From The Coordinated Party Expenditure Limits

While FECA imposes coordinated party expenditure limits on political advocacy at the core of the First Amendment's protections, such as "party coordinated communication[s]," 11 C.F.R. § 109.37, it also permits parties to engage in unlimited coordinated spending for certain purposes. For example, the Act has long allowed state and local party committees to coordinate freely with their party's general election nominees on payments for production and dissemination of "campaign materials"—"such as pins, bumper stickers, handbills, brochures, posters, party

tabloids, and yard signs"—distributed in connection with volunteer activities on behalf of the nominees, including party mass mailers disseminated with some degree of help from volunteers. 52 U.S.C. § 30101(8)(B)(ix), (9)(B)(viii). They may also do so in connection with certain voter-registration and get-out-the-vote activities for their party's presidential and vice-presidential nominees, *id.* § 30101(8)(B)(xi), (9)(B)(ix), which the FEC defined to include voter-registration and get-out-the-vote phone banks operated by volunteers, 11 C.F.R. § 100.89(e).

Moreover, in 2014, Congress amended the Act to add three new exceptions to the coordinated party expenditure limits applicable to the national party committees. Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, div. N, § 101, 128 Stat. 2130, 2772-73 (2014). FECA now permits donors to contribute up to triple the base limit for a national party committee's general account—$123,900 instead of $41,300—into "segregated account[s]" to be used to defray expenses incurred with respect to "presidential nominating convention[s]," "the construction, purchase, renovation, operation, and furnishing of one or more headquarters buildings of the party," and "election recounts and contests and other legal proceedings." 52 U.S.C. § 30116(a)(1)(B), (a)(9). Congress expressly provided that FECA's coordinated party expenditure limits do not apply to "expenditures made from any of the[se] accounts." *Id.* § 30116(d)(5).[2]

### d. The Burdens On Parties Making Independent Party Expenditures To Influence Federal Elections

FECA also permits party committees to engage in unlimited "independent expenditure[s]"—that is, expenditures "expressly advocating the election or defeat of a clearly identified [federal] candidate" that are "not made in concert or cooperation with or at the request or suggestion of [any] candidate" (or the candidate's committee or agents). 52 U.S.C. § 30101(17).

---

[2] Instead, the only cap is that regardless of coordination, a party cannot spend more than $20 million on a single convention. 52 U.S.C. § 30116(a)(9)(A). The NRSC and the NRCC do not have segregated accounts relating to presidential nominating conventions.

But by strictly limiting coordinated party expenditures and thereby forcing party committees to make independent expenditures if they wish to use their money to advocate for their party nominees unfettered, the Act imposes "additional costs and burdens" on party committees "to promote the party message." *Colorado II*, 533 U.S. at 470 (Thomas, J., dissenting).

In particular, party committees must take significant steps to ensure they could plainly satisfy the FEC that their independent expenditures are truly independent of a candidate and his campaign in the event of an FEC enforcement action. The FEC already presumes that "the ordinary means for a party to provide support is to make coordinated expenditures," *id.* at 469, and its regulations defining what "conduct" makes a party communication "coordinated" are expansive and ill-defined, 11 C.F.R. §§ 109.37(a)(3), 109.21(d)(1)-(6).

Thus, to avoid any doubt of their independence, party committees have traditionally used "firewalls" to establish separate units solely for the purpose of making independent expenditures. *See Colorado II*, 533 U.S. at 470 (Thomas, J., dissenting). These fire-walled independent expenditure units (IE units) must operate separately from the party's main operation and brain trust and independently from the supported candidates (though any advertisements they make will merely state that they were paid for by the party committee), making them inherently inefficient, potentially counterproductive to a unified message, confusing to voters, and redundantly expensive. *See* Bauer, *supra*, at 906 ("[S]eparation of party and candidate is unhealthy for candidate and party alike and introduces inefficiencies and disruptions into the political market."). Indeed, in addition to covering ordinary operating costs, a party committee that establishes an IE unit must use hard money from its operating account to "rent and furnish an office, hire staff, and pay other administrative costs" that "duplicate many of the functions already being undertaken by other party offices." *Colorado II*, 533 U.S. at 470 (Thomas, J., dissenting). And unlike coordinated

expenditures, "independent expenditures do not qualify for the lowest unit rates on the purchase of broadcasting time." *Id.* (cleaned up); *see* Thielman Decl. ¶ 22 (Doc. 19-1, PageID##179-178); Winkelman Decl. ¶ 22 (Doc. 19-2, PageID##189-190). All the while, in the absence of any coordination on messaging, content, or timing, an IE unit's communications may prove undesired or even disfavored by the main operation of the committee itself or the party nominee whom the messaging is supposed to promote. *See* Thielman Decl. ¶ 23 (Doc. 19-1, PageID#180); Winkelman Decl. ¶ 23 (Doc. 19-2, PageID#190).

### 2. Supreme Court Decisions

In *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), the Supreme Court adopted a framework for First Amendment challenges to the two forms of campaign-finance restrictions: expenditure limits and contribution limits. While acknowledging that both sets of restrictions "operate in an area of the most fundamental First Amendment activities," the Court adopted different tests for determining the constitutionality of each. *Id.* at 14.

The Supreme Court held that *expenditure* restrictions "limit political expression 'at the core of our electoral process and of the First Amendment freedoms.'" *Id.* at 39. Effective political dialogue, the Court explained, requires the spending of money. As the Court observed, "virtually every means of communicating ideas in today's mass society requires the expenditure of money," as "[t]he electorate's increasing dependence on television, radio, and other mass media for news and information has made these expensive modes of communication indispensable instruments of effective political speech." *Id.* at 19. Restrictions on expenditures therefore hamper freedom of expression by limiting "the number of issues discussed, the depth of their exploration, and the size of the audience reached" and thus represent substantial, not theoretical, constraints on the quantity and diversity of political speech. *Id.* Put differently, "[b]eing free to engage in unlimited political

14

expression subject to a ceiling on expenditures is like being free to drive an automobile as far and as often as one desires on a single tank of gasoline." *Id.* at 19 n.18. The Court therefore subjected expenditure limits to "the exacting scrutiny applicable to limitations on core First Amendment rights of political expression." *Id.* at 44-45.

By contrast, the Supreme Court determined that controlling the amount one may *contribute* to a candidate or political committee "entails only a marginal restriction upon the contributor's ability to engage in free communication." *Id.* at 20. The Court therefore subjected contribution limits to a less demanding test, "closely drawn" scrutiny, holding that such limits are constitutional so long as the government "demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." *Id.* at 25.

As originally enacted, FECA prohibited party committees from making even independent expenditures in support of candidates. In 1996, a fractured Supreme Court applied exacting scrutiny and held that this expenditure limit violated the First Amendment. *Colorado I*, 518 U.S. at 613-19 (plurality opinion).

Five years later, however, the Supreme Court upheld FECA's limits on coordinated party expenditures in *Colorado II* by a 5-4 vote. 533 U.S. at 437. The majority deemed coordinated party *expenditures* to be "the functional equivalent of *contributions*" and therefore applied the "closely drawn" test, not exacting scrutiny, to resolve the First Amendment challenge to the coordinated party expenditure limits. *Id.* at 446-47, 456 (emphasis added).

Under its application of that standard, the majority upheld the coordinated party expenditure limits "on the theory that unlimited coordinated spending by a party raises the risk of corruption (and its appearance)." *Id.* at 456. The majority recognized that the government has a sufficiently important interest in "combating political corruption" to justify campaign-finance

restrictions. *Id.* But it broadly defined "corruption" to encompass not only "*quid pro quo* agreements, but also … undue influence on an officeholder's judgment" purportedly flowing from "the corrupting influence of large contributions to candidates." *Id.* at 441, 456 n.18. And it expressly did not address whether the coordinated party expenditure limits prevent "*quid pro quo*" corruption, *id.* at 456 n.18, perhaps because the government "presented no evidence at all of corruption or the perception of corruption," *id.* at 475 (Thomas, J., dissenting). Instead, the majority believed that the limits were justified to prevent individual donor access to and influence upon candidates and officeholders. *See id.* at 458-61 (majority opinion).

In applying its formulation of the "closely drawn" test, the majority rejected the argument that "the First Amendment demands a response better tailored" to the ills the majority identified "than a limitation on [coordinated] spending." *Id.* at 462. The majority also never used the term "narrowly tailored" in its opinion.

Justice Thomas—joined by Chief Justice Rehnquist in part and Justices Scalia and Kennedy in full—dissented. *Id.* at 465-82 (Thomas, J., dissenting). The four dissenters reasoned that the coordinated party expenditure limits trigger, and fail, strict scrutiny as unconstitutional restrictions on expenditures. *Id.* at 466-74. In the alternative, they explained that the coordinated party expenditure limits fail "closely drawn" scrutiny because there is no evidence "that coordinated expenditures by parties give rise to corruption" and "there are better tailored alternatives" available to prevent corruption. *Id.* at 474, 481.

**B.      This Case**

On November 4, 2022, the NRSC, the NRCC, Senator Vance, and former Representative Chabot brought this suit for declaratory and injunctive relief against the enforcement of § 30116's limits on coordinated party expenditures. ECF 1 (Doc. 1, PageID##1-28). Senator Vance, who intends to run for federal office again, desires to engage in coordinated party expenditures in a

future federal campaign beyond the limits in § 30116, and would do so but for this statutory provision and the threat of FEC enforcement. Vance Decl. ¶¶ 10-14 (Doc. 19-3, PageID##196-197).

The NRSC and the NRCC likewise wish to exceed these limits to support candidates across the country in future elections, Senator Vance included, but will not do so while the risk of FEC enforcement exists. Thielman Decl. ¶¶ 26-29 (Doc. 19-1, PageID#181); Winkelman Decl. ¶¶ 26-29 (Doc. 19-2, PageID#191). Until then, both the NRSC and the NRCC will be forced to rely on their segregated IE units to support their preferred candidates. Thielman Decl. ¶¶ 24, 28-29 (Doc. 19-1, PageID##180-181); Winkelman Decl. ¶¶ 24, 28-29 (Doc. 19-2, PageID##190-191). Creating and maintaining these units imposes significant costs on the Committees, and their IE units also cannot purchase television advertisements at the lowest-unit rates. Thielman Decl. ¶¶ 18-24 (Doc. 19-1, PageID##178-180); Winkelman Decl. ¶¶ 18-24 (Doc. 19-2, PageID##188-190). These burdens put the NRSC and the NRCC at a competitive disadvantage vis-à-vis Super PACs in securing donations. Thielman Decl. ¶ 25 (Doc. 19-1, PageID#180); Winkelman Decl. ¶ 25 (Doc. 19-2, PageID#190).

To avoid these harms in future campaigns, Plaintiffs brought this lawsuit and invoked FECA's judicial review provision, which allows "the national committee of any political party[] or any individual eligible to vote in any election for the office of President" to "institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act." 52 U.S.C. § 30110. While the FEC has acknowledged that the NRSC and the NRCC each qualify as a "national committee of a political party" and that Senator Vance and former Representative Chabot are individuals "eligible to vote" in presidential elections, it asked this Court to dismiss

this case for lack of venue or transfer it. ECF 10 at 1, 2, 8 (Doc. 10, PageID##81-82, 91). This Court denied the FEC's motion on May 9. ECF 18, at 1-19 (Doc. 18, PageID##151-169).

## SUMMARY OF THE ARGUMENT

This Court should certify to the en banc Sixth Circuit the question whether FECA's coordinated party expenditure limits violate the First Amendment, and the Sixth Circuit should hold that they do. This question easily qualifies as non-frivolous, which is the only legal determination this Court must make at this stage.

I.      The coordinated party expenditure limits violate the First Amendment even under "closely drawn" scrutiny. These limits do not pursue the prevention of *quid pro quo* corruption at all, either by party committees or individual donors. Indeed, Congress's selective imposition of this additional prophylactic measure on some coordinated payments, while permitting others, confirms these limits instead seek to further the constitutionally impermissible purpose of reducing excessive campaign spending. And even if the coordinated party expenditure limits somehow addressed *quid pro quo* corruption in the first place, they would not be a narrowly tailored response to that problem, as less restrictive alternatives are readily available.

II.     *Colorado II* does not preclude certification. This challenge involves both a different statutory regime and different legal arguments from the ones at issue in *Colorado II*, which means the en banc Sixth Circuit can give the question here plenary consideration. But even if *Colorado II* controls, this Court should still certify the question because Plaintiffs have presented a compelling—and certainly non-frivolous—argument that *Colorado II* cannot be sustained under the traditional factors justifying *stare decisis*. The poor quality of its reasoning, the significant legal and factual developments in the 22 years since it was handed down, and the absence of any reliance interests all cut against retaining this distortion of the First Amendment any longer.

18

**ARGUMENT**

"The district court immediately shall certify all questions of constitutionality of [FECA] to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc." 52 U.S.C. § 30110. This Court thus is "required" to "ma[k]e findings of fact and then certif[y] the case" to the en banc Sixth Circuit "for a determination on the constitutional questions raised"—here, whether FECA's coordinated party expenditure limits violate the First Amendment. *Bread Pol. Action Comm. v. FEC*, 455 U.S. 577, 580 (1982). While this Court need not certify "frivolous" questions, *Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 192 n.14 (1981), whether FECA's coordinated party expenditure limits contravene the First Amendment easily clears that "low bar," *Holmes*, 823 F.3d at 72-74.

## I. THE COORDINATED PARTY EXPENDITURE LIMITS VIOLATE THE FIRST AMENDMENT.

FECA's coordinated party expenditure limits strike "precisely" where the First Amendment has its "most urgent application": "the conduct of campaigns for political office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971). There can be "no doubt" that the limits "burden First Amendment electoral speech" and association. *Cruz*, 142 S. Ct. at 1651; *see, e.g.*, *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 746 (2011) ("[W]e do not need empirical evidence to determine that the law at issue is burdensome."). Even the *Colorado II* majority acknowledged that the limits "burden" speech and "associational efficiency," 533 U.S. at 450 n.11 & 453, and the dissenters further explained just how severely they do so, *see id.* at 467-74 (Thomas, J., dissenting). Plaintiffs continue to suffer those harms today. *See* Thielman Decl. ¶¶ 11-29 (Doc. 19-1, PageID##176-181); Vance Decl. ¶¶ 11-14 (Doc. 19-3, PageID##196-197); Winkelman Decl. ¶¶ 11-29 (Doc. 19-2, PageID##186-191). The government therefore "bears the burden of proving the constitutionality of" these selective, redundant limits on political speech and

association, *McCutcheon*, 572 U.S. at 210 (plurality opinion), and cannot do so here under any applicable level of scrutiny or on any conceivable record. While *Colorado II* held that coordinated party expenditure limits should be treated as "contribution limits" subject to "closely drawn" scrutiny under *Buckley*, 533 U.S. at 456, these limits, as they stand today, fail even this less demanding test. Under "closely drawn" scrutiny, the government must still prove that the challenged law both furthers "a sufficiently important interest and employs means closely drawn" to do so, *McCutcheon*, 572 U.S. at 197 (plurality opinion). The government cannot satisfy either requirement.

### A. The Coordinated Party Expenditure Limits Do Not Prevent *Quid Pro Quo* Corruption.

Even under "'closely drawn' scrutiny," the government "must prove at the outset that it is in fact pursuing a legitimate objective." *Cruz*, 142 S. Ct. at 1652. It cannot do so here.

1.      The Supreme Court "has recognized only one permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance." *Id.*; *accord McCutcheon*, 572 U.S. at 206 (plurality opinion). This "captures the notion of a direct exchange of an official act for money"—*i.e.*, "dollars for political favors." *McCutcheon*, 572 U.S. at 192 (plurality opinion). "Campaign finance restrictions that pursue other objectives … impermissibly inject the Government 'into the debate over who should govern.'" *Id.* Thus, Congress may not limit political speech "to reduce the amount of money in politics," "to level electoral opportunities by equalizing candidate resources," or "to limit the general influence a contributor may have over an elected official." *Cruz*, 142 S. Ct. at 1652. Moreover, "[i]ngratiation and access … are not corruption"; preventing donor ingratiation with, access to, or influence over elected officials is therefore not a sufficiently weighty interest to support campaign-finance restrictions. *Citizens United*, 558 U.S. at 360; *accord McCutcheon*, 572 U.S. at 192, 208 (plurality opinion).

To show that a speech restriction prevents *quid pro quo* corruption or its appearance, the government must "do more than 'simply posit the existence of the disease sought to be cured'"; it must show that the challenged restriction itself is necessary to prevent *quid pro quo* corruption. *Cruz*, 142 S. Ct. at 1653. This rule has special significance in analyzing the constitutionality of FECA provisions because "the *base limits* themselves"—as well as the earmarking rule and disclosure requirements—are "prophylactic measure[s]" that prevent corruption and its appearance. *McCutcheon*, 572 U.S. at 221 (plurality opinion). Thus, when the government goes beyond those measures and layers overlapping campaign-finance restrictions "on top," it takes a "prophylaxis-upon-prophylaxis approach." *Id.*; *accord Cruz*, 142 S. Ct. at 1653. In that scenario, courts must "greet the assertion of an anticorruption interest … with a measure of skepticism," and insist that the government produce "'record evidence or legislative findings' demonstrating the need to address a special problem" that the base limits themselves do not already address. *Cruz*, 142 S. Ct. at 1652-53; *see McCutcheon*, 572 U.S. at 221 (plurality opinion); *Holmes v. FEC*, 875 F.3d 1153, 1161 (D.C. Cir. 2017) (en banc); *Jones v. Jegley*, 947 F.3d 1100, 1106 (8th Cir. 2020); *Zimmerman v. City of Austin*, 881 F.3d 378, 392 (5th Cir. 2018). And if there is any doubt whether the government has carried its demanding burden, "the First Amendment requires [courts] to err on the side of protecting political speech rather than suppressing it." *Cruz*, 142 S. Ct. at 1653; *accord McCutcheon*, 572 U.S. at 209 (plurality opinion).

**2.** The government cannot satisfy that demanding burden here. There is no evidence that coordinated party expenditures in excess of the limits Congress has imposed would give rise to "'*quid pro quo*' corruption"—the "direct exchange of an official act for money." *McCutcheon*, 572 U.S. at 192 (plurality opinion). Congress did not even enact the coordinated party expenditure limits to address that problem. To the contrary, all indicia "suggest that Congress wrote the Party

Expenditure Provision not so much because of a special concern about the potentially 'corrupting' effect of party expenditures, but rather for the constitutionally insufficient purpose of reducing what it saw as wasteful and excessive campaign spending." *Colorado I*, 518 U.S. at 618 (plurality opinion). "In fact, rather than indicating a special fear of the corruptive influence of political parties, the legislative history demonstrates Congress' general desire to enhance what was seen as an important and legitimate role for political parties in American elections." *Id.*

Indeed, the notion that a political party committee can corrupt its *own* candidates makes no sense because "[t]he very aim of a political party is to influence its candidate's stance on issues and, if the candidate takes office or is reelected, his votes." *Colorado II*, 533 U.S. at 476 (Thomas, J., dissenting). "If coordinated expenditures help achieve this aim, the achievement does not constitute a subversion of the political process," let alone *quid pro quo* corruption, but instead the *functioning* of the political process. *Id.* at 477 (cleaned up). Perhaps recognizing that "[p]olitical parties and their candidates are 'inextricably intertwined' in the conduct of an election," the *Colorado II* majority expressly declined "to reach" whether the coordinated party expenditure limits could be "justified by a concern with *quid pro quo* arrangements and similar corrupting relationships between candidates and parties themselves." *Id.* at 456 n.18, 469 (majority opinion).

Nor is there any evidence that coordinated *party* expenditures somehow invite *quid pro quo* corruption by *individual* donors. The government produced no such evidence in *Colorado II*, *see id.* at 475 (Thomas, J., dissenting), and there is simply no plausible argument that the coordinated party expenditure limits prevent *quid pro quo* corruption or "circumvention of the base limits" on individual contributions, *McCutcheon*, 572 U.S. at 193 (plurality opinion). "As an initial matter, there is not the same risk of *quid pro quo* corruption or its appearance when money flows through independent actors to a candidate, as when a donor contributes to a candidate

directly." *Id.* at 210. That is because "[w]hen an individual contributes to a candidate, a party committee, or a PAC, the individual must by law cede control over the funds." *Id.* at 210-11. Even the government has "admit[ted]" that when "the funds are subsequently re-routed to a particular candidate, such action occurs at the initial recipient's discretion—not the donor's." *Id.* at 211. "As a consequence, the chain of attribution grows longer, and any credit must be shared among the various actors along the way." *Id.* "For th[e]se reasons, the risk of *quid pro quo* corruption is generally applicable only to 'the narrow category of money gifts that are directed, in some manner, to a candidate or officeholder,'" not to a political party committee. *Id.* Furthermore, political parties "have numerous members with a wide variety of interests," making "the influence of any one person … significantly diffused." *Colorado I*, 518 U.S. at 647 (Thomas, J., concurring in the judgment and dissenting in part). Thus, so long as donors face "uniform" "limits on the amount they can give to parties," "there is little risk that an individual donor could use a party as a conduit for bribing candidates." *Id.*

Plaintiffs also are not aware of any "real-world examples of" *quid pro quo* corruption in the absence of coordinated party expenditure limits. *McCutcheon*, 572 U.S. at 217 (plurality opinion). As explained, Congress has selectively permitted certain coordinated payments by parties. This includes coordinated party expenditures below Congress's arbitrary limits; certain exempt payments for presidential phone banks, party mailers, and other "campaign materials" featuring express advocacy disseminated with a sufficient degree of volunteer involvement, 52 U.S.C. § 30101(8)(B)(ix), (9)(B)(viii), and *all* coordinated payments from the national party committees' "segregated account[s]" for "presidential nominating convention[s]," "headquarters buildings," and "election recounts and contests and other legal proceedings," *id.* § 30116(a)(1)(B), (a)(9), (d)(5). Yet Plaintiffs know of no evidence that any of the various categories of coordinated

party spending that FECA permits has resulted in "'quid pro quo' corruption or its appearance." *Cruz*, 142 S. Ct. at 1652; *see* Thielman Decl. ¶ 10 (Doc. 19-1, PageID#176); Winkelman Decl. ¶ 10 (Doc. 19-2, PageID#186); Vance Decl. ¶ 11 (Doc. 19-3, PageID#196). Presumably, if such evidence existed, Congress would have prohibited, rather than permitted, those payments. Congress's allowance of these categories of coordinated payments—including coordinated party expenditures up to a dollar threshold based on nothing more than the office sought, state, and voting-age population—thus underscores that the coordinated party expenditure limits do not prevent "'quid pro quo' corruption or its appearance." *Cruz*, 142 S. Ct. at 1652.

Moreover, at least 28 states largely give the parties free rein to make coordinated expenditures on behalf of their state-level nominees, even though 17 of these states impose generally applicable base limits on contributions from individuals seeking to support the same candidates. Plaintiffs are unaware of any evidence of *quid pro quo* corruption in these states—a "significant" sign of a First Amendment problem with FECA's coordinated party expenditure limits. *Id.* at 1653; *see McCutcheon*, 572 U.S. at 209 n.7 (plurality opinion).[3]

Finally, in all events, Congress's line-drawing between permitted and prohibited coordinated spending renders the coordinated party expenditure limits "so woefully underinclusive" that Congress could not have adopted them for "th[e] purpose" of preventing *quid pro quo* corruption. *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002); *see Williams-*

---

[3] *See* Ala. Code § 17-5-15; Ariz. Rev. Stat. §§ 16-911(B)(4)(b), 16-912, 16-915; Cal. Gov't Code §§ 85301, 85400; 10 Ill. Comp. Stat. 5/9-8.5(b); Ind. Code § 3-9-2-1 *et seq.*; Iowa Code § 68A.101 *et seq.*; Kan. Stat. § 25-4153(a); Ky. Rev. Stat. § 121.150; La. Stat. § 18:1505.2(H)(1); 970 Mass. Code Regs. 1.04(12); Miss. Code § 23-15-1021; Neb. Rev. Stat. ch. 32, art. 16 (repealed); N.J. Stat. § 19:44A-29; N.J. Admin. Code § 19:25-11.2; N.M. Stat. § 1-19-34.7; N.Y. Elec. Law § 14-114(1), (3); N.C. Gen. Stat. § 163-278.13; N.D. Cent. Code § 16.1-08.1-01 *et seq.*; Ohio Rev. Code § 3517.102(B); Or. Rev. Stat. § 260.005 *et seq.*; 25 Pa. Cons. Stat. § 3241 *et seq.*; S.D. Codified Laws §§ 12-27-7, 12-28-8; Tex. Elec. Code § 253.001 *et seq.*; Utah Code § 20A-11-101 *et seq.*; Vt. Stat. tit. 17, § 2941(a); Va. Code § 24.2-945; W. Va. Code § 3-8-5c; Wis. Stat. §§ 11.1101(1), 11.1104(5); Wyo. Stat. § 22-25-102.

*Yulee v. Fla. Bar*, 575 U.S. 433, 448-49 (2015) ("[U]nderinclusiveness can raise 'doubts about whether the government is in fact pursuing the interest it invokes'" and "can also reveal that a law does not actually advance a compelling interest."). For example, there is no principled basis under the First Amendment for the applicability of the coordinated party expenditure limits to rest on whether some desired level of volunteer effort is involved in a party's dissemination of certain general election advocacy, such as campaign mailers and presidential get-out-the-vote phone banks. Yet FECA does precisely that. *Compare* 52 U.S.C. § 30101(8)(B)(ix), (9)(B)(viii), *with id.* § 30116(d). Nor is there any good explanation for why Congress permits political parties to engage in unlimited coordinated spending—from accounts with base donation limits three times as high as those governing their general accounts—for "election recounts and contests and other legal proceedings," for instance, but not for political advertisements. *Id.* § 30116(a)(9); *see* Thielman Decl. ¶ 17 (Doc. 19-1, PageID#178); Winkelman Decl. ¶ 17 (Doc. 19-2, PageID#188). "[G]iven Congress' judgment that liberalized limits for" coordinated party expenditures in select areas "do not unduly imperil anticorruption interests, it is hard to imagine how the denial of liberalized limits to" coordinated party expenditures more generally "can be regarded as serving anticorruption goals sufficiently to justify the resulting constitutional burden." *Davis v. FEC*, 554 U.S. 724, 741 (2008).

**B.** **Even If The Coordinated Party Expenditure Limits Actually Prevented *Quid Pro Quo* Corruption, They Are Not Closely Drawn Means Of Doing So.**

In any event, even if the "prophylaxis-upon-prophylaxis" coordinated party expenditure limits somehow addressed *quid pro quo* corruption, they still would not be a "closely drawn" response to that concern. *McCutcheon*, 572 U.S. at 218, 221 (plurality opinion). Recent Supreme Court decisions underscore that this test requires "rigorous" review—specifically, the government must show the challenged law is "narrowly tailored" to "achieve" the interest of preventing *quid pro quo* corruption. *Id.* at 197, 218; *see Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383

(2021) (*AFP*) (explaining that "exacting scrutiny" for "compelled disclosure requirements," including in the "campaign finance" realm, requires that the requirements "be narrowly tailored to the government's asserted interest"). As part of that inquiry, courts must ask whether there are "alternatives available" that would serve the government's interest in preventing *quid pro quo* corruption, while "avoiding 'unnecessary abridgment' of First Amendment rights." *McCutcheon*, 572 U.S. at 221 (plurality opinion). The government must therefore "demonstrate its need" for the coordinated party expenditure limits "in light of any less intrusive alternatives." *AFP*, 141 S. Ct. at 2386. And courts must "be particularly diligent in scrutinizing the law's fit" where, as here, it is a "prophylaxis-upon-prophylaxis approach." *McCutcheon*, 572 U.S. at 221 (plurality opinion).

The government cannot show that the coordinated party expenditure limits are narrowly tailored to preventing *quid pro quo* corruption. The base limits, earmarking rule, and disclosure requirements already provide the appropriate alternative means by which Congress or the FEC can "minimize[] the potential for abuse of the campaign finance system" without imposing a limit or "ceiling on speech" of party committees. *Id.* at 223. "[G]iven that 'few if any contributions to candidates will involve *quid pro quo* arrangements,'" the base contribution limits, the earmarking rule, and public-disclosure requirements "are themselves prophylactic measures," designed to prevent *quid pro quo* corruption and circumvention of candidate contribution limits. *Cruz*, 142 S. Ct. at 1652; *see McCutcheon*, 572 U.S. at 223-24 (plurality opinion). Indeed, through the earmarking rule, Congress foresaw the risk of "an individual us[ing] the party as a conduit to channel money to specified candidates," and "foreclosed it." *FEC v. Colo. Republican Fed. Campaign Comm.*, 213 F.3d 1221, 1232 (10th Cir. 2000), *rev'd by Colorado II*, 533 U.S. 431; *see McCutcheon*, 572 U.S. at 222-23 (plurality opinion) (explaining that "the earmarking rules" "already prohibit[]" not only explicit, but "implicit agreements to circumvent the base limits").

And the Supreme Court has emphasized that public "disclosure often represents a less restrictive alternative to flat bans on certain types or quantities of speech," and "[w]ith modern technology, disclosure now offers a particularly effective means of arming the voting public with information" and providing "robust protections against corruption." *McCutcheon*, 572 U.S. at 223-24 (plurality opinion). If Congress is concerned about the efficacy of those existing measures, it can tighten them before turning to the speech rationing of the coordinated party expenditure limits. *See id.* at 222-24.

By contrast, "even if" coordinated party expenditures could raise a legitimate *quid pro quo* "concern in some cases," Congress's "indiscriminate" imposition of these speech limits "in all cases would not be justified." *AFP*, 141 S. Ct. at 2387. The coordinated party expenditure limits therefore do not "fit" the objective of preventing *quid pro quo* corruption. *McCutcheon*, 572 U.S. at 218 (plurality opinion). Instead, they violate the First Amendment. *See id.*; *Cruz*, 142 S. Ct. at 1653; *Jones*, 947 F.3d at 1107; *Zimmerman*, 881 F.3d at 395.

## II. *COLORADO II* DOES NOT PRECLUDE CERTIFICATION.

While *Colorado II* upheld FECA's coordinated party expenditure limits as they stood in 2001, that ruling does not prevent this Court from certifying the question presented for two reasons. *First*, *Colorado II* does not control this challenge, meaning the en banc Sixth Circuit is free to hold that the coordinated party expenditure limits as they stand today violate the First Amendment. *Second*, even if *Colorado II* barred the Sixth Circuit from considering the issue afresh, Plaintiffs have presented a non-frivolous argument why the Supreme Court should overrule that decision.

### A. *Colorado II* Does Not Control.

*Colorado II* does not preclude Plaintiffs' challenge for two reasons. *First*, the coordinated party expenditure limits that FECA "imposes operate against a distinct legal backdrop" that did not exist at the time *Colorado II* was decided in 2001. *McCutcheon*, 572 U.S. at 200 (plurality

opinion). In 2014, Congress approved unlimited coordinated payments in other forms, such as for "presidential nominating convention[s]," party "headquarters buildings," and "election recounts and contests and other legal proceedings." 52 U.S.C. § 30116(a)(9). As explained, these exceptions have rendered FECA's coordinated party expenditure limits fatally underinclusive (to the extent they were not so before). *See supra* Pt. I.A.

That "statutory … change[] in the campaign finance arena" means that Plaintiffs' "substantial First Amendment challenge to the system of [coordinated party expenditure] limits currently in place" deserves "plenary consideration." *McCutcheon*, 572 U.S. at 202-03 (plurality opinion). In *McCutcheon*, for instance, the Supreme Court held that *Buckley*'s upholding of "the aggregate limit in place" in 1976 did "not control" the Court's resolution of a new constitutional challenge to "the aggregate limits in place" in 2014 because "statutory safeguards against circumvention have been considerably strengthened since *Buckley* was decided." *Id.* at 200. Given that "different statutory regime," the Court considered the issue without any need to apply the traditional *stare decisis* factors. *Id.* Similarly, in *LNC*—a case certified under § 30110—the en banc D.C. Circuit gave plenary consideration to a First Amendment challenge to the "sort of contribution limits that the Supreme Court upheld in *McConnell*" because the 2014 amendment had "radically altered FECA's nature and structure" by "introduc[ing] gradations into the political party contribution limit where none had been before." 924 F.3d at 546-47; *see id.* at 546-52. Accordingly, the Sixth Circuit is free to consider this "new scheme," as *Colorado II* "did not address the propriety of a regime with these exceptions, the presence of which 'can raise doubts about whether the government is in fact pursuing the interest it invokes' or 'reveal that a law does not actually advance' that interest." *Id.* at 553-54 (Griffith, J., concurring in party and dissenting in part).

28

*Second*, "[i]n addition to accounting for [this] statutory … change[]," Plaintiffs' "challenge raises distinct legal arguments that [*Colorado II*] did not consider"—another fact calling for "plenary consideration." *McCutcheon*, 572 U.S. at 202-203 (plurality opinion). For example, the challenger's brief in *Colorado II* did not even mention "*quid pro quo* corruption," but instead addressed the government's theory that "large coordinated expenditures by political parties … may be used to exert influence over legislators' behavior while in office,'" Resp. Br. at 33, *Colorado II*, 533 U.S. 431 (No. 00-191), 2001 WL 43228 (*Colorado II* Resp. Br.). The *Colorado II* majority therefore never addressed whether the coordinated party expenditure limits can be justified as preventing *quid pro quo* corruption or its appearance, *see* 533 U.S. at 456 n.18, perhaps because the government "presented no evidence at all of corruption or the perception of corruption" in that case, *id.* at 475 (Thomas, J., dissenting). Here, Plaintiffs' challenge zeroes in on the coordinated party expenditure limits' failure to address *quid pro quo* corruption, *see supra* Part I.A, which the Supreme Court has since made clear is the only "permissible ground for restricting political speech," *Cruz*, 142 S. Ct. at 1652; *accord McCutcheon*, 572 U.S. at 207 (plurality opinion).

Similarly, the challenger in *Colorado II* never contended that "closely drawn" scrutiny required the coordinated party expenditure limits to be narrowly tailored, but instead assumed that "narrow tailoring" was "required" only under "strict scrutiny." *Colorado II* Resp. Br. at 47-48. Accordingly, the *Colorado II* majority never even used the phrase "narrowly tailored" in its analysis, much less applied that test. Instead, it upheld the limits even though "better tailored" alternatives were available, noting that it would "not throw out the contribution limits for unskillful tailoring" either. 533 U.S. at 462, 463 n.26. By contrast, Plaintiffs here raise the challenge that the coordinated party expenditure limits are not "narrowly tailored," *see supra* Part I.B, in part because they represent a "prophylaxis-upon-prophylaxis approach" layered "on top" of the base limits,

earmarking rule, and disclosure requirements, all of which—as the Supreme Court has since held—are "prophylactic measures" better tailored to prevent *quid pro quo corruption*, *McCutcheon*, 572 U.S. at 221-24 (plurality opinion); *Cruz*, 142 S. Ct. at 1652.

### B. *Colorado II* Should Be Overruled.

Even if *Colorado II* were controlling here, this Court should still certify the question presented so that the Supreme Court can rectify FECA's ongoing abridgement of core First Amendment freedoms. While "district courts do not certify 'frivolous' constitutional questions" under § 30110, "it is entirely possible to mount a non-frivolous argument against what might be considered 'settled' Supreme Court constitutional law," including "in the context of federal campaign finance law." *Holmes*, 823 F.3d at 71-74; *see, e.g.*, *Citizens United*, 558 U.S. at 365. And here, the case for overturning *Colorado II* under the traditional *stare decisis* factors is a anything but frivolous. To the contrary, three of those factors weigh strongly in favor of overruling that decision: "the quality of [its] reasoning," "developments since the decision was handed down," and the absence of legitimate "reliance" interests. *Janus*, 138 S. Ct. at 2478-79.

1.      For starters, *Colorado II* was "poorly reasoned"—an "important factor in determining whether a precedent should be overruled." *Id.* at 2479. As explained, the coordinated party expenditure limits cannot satisfy even "closely drawn" scrutiny. *See supra* Pt. I. Indeed, even commentators generally sympathetic to limiting the role of money in politics have been highly critical of *Colorado II*'s analysis. For example, one described it as producing "jurisprudential incoherence" by indulging in "the fiction" that the Court was "adhering to the anticorruption rationale of *Buckley*" while it "reduced the evidentiary burden" and "relaxed the level of scrutiny." Richard L. Hasen, Buckley *Is Dead, Long Live* Buckley*: The New Campaign Finance Incoherence of* McConnell v. Federal Election Commission, 153 U. Pa. L. Rev. 31, 32, 42-45 (2004); *see, e.g.*,

Samuel Issacharoff, *Outsourcing Politics: The Hostile Takeover of Our Hollowed-Out Political Parties*, 54 Hous. L. Rev. 845, 863 (2017) (criticizing the *Colorado II* majority for acting like "naïve regulators").

In addition, *Colorado II* committed a critical threshold error in applying "closely drawn" scrutiny in the first place. *Colorado II* started from the premise that coordinated party expenditure limits should be treated as "contribution limits" subject to "closely drawn" scrutiny under *Buckley*. 533 U.S. at 456. As an initial matter, the *Buckley* framework, by exempting contribution restrictions from the First Amendment's strict scrutiny, "denigrates core First Amendment speech" and "should be overruled." *McCutcheon*, 572 U.S. at 228 (Thomas, J., concurring in the judgment); *accord Colorado II*, 533 U.S. at 465-66 (Thomas, J., dissenting). Instead, strict scrutiny should apply to *all* campaign-finance restrictions, including contribution limits. *See McCutcheon*, 572 U.S. at 228 (Thomas, J., concurring in the judgment); *accord Colorado II*, 533 U.S. at 465-66 (Thomas, J., dissenting). But in any event, the coordinated party expenditure limits trigger strict scrutiny even under *Buckley*'s framework for at least two reasons.

*First,* coordinated party *expenditures* are, by their very terms, *expenditures*, not "the functional equivalent of *contributions*." *Colorado II*, 533 U.S. at 447 (emphasis added). Coordinated party expenditures are the political speech of the party in association with its own candidates "during a campaign for political office" and, thus, are entitled to the highest level of First Amendment protection. *Eu*, 489 U.S. at 223; *accord McCutcheon*, 572 U.S. at 191 (plurality opinion). Contributions, by contrast, occur when a donor transfers money and "cede[s] control over the funds." *McCutcheon*, 572 U.S. at 210-11 (plurality opinion). But that *never* occurs with coordinated party expenditures. *See* Thielman Decl. ¶ 12 (Doc. 19-1, PageID#177); Vance Decl. ¶ 10 (Doc. 19-3, PageID#196); Winkelman Decl. ¶ 12 (Doc. 19-3, PageID#187). Instead, the party

committee retains ownership and ultimate control over the funds and how they are spent. *See id.* A candidate or campaign may suggest or recommend how the money should be spent, or even assent to a suggestion originating from the party, but it is ultimately the party committee's decision whether and how to spend its own scarce resources. *See id.* Thus, under *Buckley*, coordinated party *expenditures* should be considered *expenditures* protected by strict scrutiny, not contributions implicating a lower level of scrutiny. *See* 424 U.S. at 197.

*Second*, even if one (wrongly) thinks that some "coordinated expenditures are functionally equivalent to contributions," that would not ward off strict scrutiny here, because "[t]he source of the 'contribution' at issue is a political party, not an individual or a political committee." *Colorado II*, 533 U.S. at 468 (Thomas, J., dissenting). *Buckley* excepted contribution limits from strict scrutiny on the theory that they impose "little direct restraint" on political speech because they do not "in any way infringe the contributor's freedom to discuss candidates and issues." 424 U.S. at 21. The coordinated party expenditure limits, however, do just that, as Plaintiffs' experience shows. *See* Thielman Decl. ¶¶ 11-29 (Doc. 19-1, PageID##176-181); Vance Decl. ¶¶ 11-14 (Doc. 19-3, PageID##196-197); Winkelman Decl. ¶¶ 11-29 (Doc. 19-2, PageID##186-191). Thus, "[r]estricting contributions by individuals and political committees may, under *Buckley*, entail only a 'marginal restriction,' but the same cannot be said about limitations on political parties." *Colorado II*, 533 U.S. at 469 (Thomas, J., dissenting) (citation omitted).

Indeed, many forms of coordinated party expenditures "largely resemble, and should be entitled to the same protection as, independent expenditures." *Id.* at 467. For example, if a "party develops a television advertising campaign touting a candidate's record on education, and the party simply consults with the candidate on which time slot the advertisement should run for maximum effectiveness," there is "no constitutional difference between this expenditure and a purely

independent one." *Id.* at 468 (cleaned up). In addition, such an advertisement is "a clear manifestation of the party's most fundamental political views." *Id.* "By restricting such speech," the limits harm "parties' 'freedom to discuss candidates and issues'" in contravention of the First Amendment. *Id.* Thus, at a bare minimum, the limits are unconstitutional as applied to party spending in connection with "party coordinated communications" as defined in 11 C.F.R. § 109.37—*i.e.*, core political advertising. *See supra* at 10-11.

More generally, "[p]olitical parties and their candidates are 'inextricably intertwined' in the conduct of an election." *Colorado II*, 533 U.S. at 469 (Thomas, J., dissenting). "A party nominates its candidate; a candidate often is identified by party affiliation throughout the election and on the ballot; and a party's public image is largely defined by what its candidates say and do." *Id.* "Most importantly, a party's success or failure depends in large part on whether its candidates get elected." *Id.* "Because of this unity of interest, it is natural for a party and its candidate to work together and consult with one another during the course of the election." *Id.* Accordingly, because parties are collective political enterprises, *see Eu*, 489 U.S. at 222-23, "the ordinary means for a party to provide support is to make coordinated expenditures," which means that the coordinated party expenditure limits "ha[ve] restricted the party's most natural form of communication; ha[ve] precluded parties from effectively amplifying the voice of their adherents; and ha[ve] had a stifling effect on the ability of the party to do what it exists to do." *Colorado II*, 533 U.S. at 469-71 (Thomas, J., dissenting) (cleaned up). In other words, the coordinated party expenditure limits infringe both "the [parties'] freedom to discuss candidates and issues," *Buckley*, 424 U.S. at 21, and their "freedom of association" to support their "standard bearer[s] who … represent[] the party's ideologies and preferences" in elections, *Eu*, 489 U.S. at 224.

While acknowledging that there is "no doubt" that the coordinated party expenditure limits "affected parties' roles and their exercise of power," the *Colorado II* majority dismissed this harm on the view "that it is nonetheless possible for parties, like individuals and nonparty groups, to speak independently," and that "'in reality, political parties are dominant players, second only to the candidates themselves, in federal elections.'" 533 U.S. at 449-50 & n.11 (brackets omitted). But as explained above, the coordinated party expenditure limits impose significant compliance costs on party committees that seek to engage in independent expenditures, which they may do only through expensive and redundant IE units, forcing an unnatural (and confusing) split in the operation of the party committee itself and between the party committee and its supported candidate. *See supra* at 13-14. Moreover, the *Colorado II* majority's view misses the point. A federal "law imposing a $1,000 tax on every political newspaper editorial" would trigger, and fail, strict scrutiny, "even though it would still be *possible* for newspapers to print such editorials," and even if newspapers remained the dominant media players under that scheme. 533 U.S. at 471 n.3 (Thomas, J., dissenting). The same goes for the coordinated party expenditure limits.

Because these limits cannot survive even the less demanding "closely drawn" test, they plainly cannot withstand strict scrutiny. *See supra* Pt. I. Indeed, in *Colorado II*, the government did "not attempt to argue" that FECA's coordinated party expenditure limits "satisf[y] strict scrutiny." 533 U.S. at 466 (Thomas, J., dissenting). "Nor could it" have done so, *id.*, as these selective, redundant limits neither "promote[] a compelling interest" at all nor "are the least restrictive means to further [that] interest," *McCutcheon*, 572 U.S. at 197 (plurality opinion).

**2.** "Developments since [*Colorado II*], both factual and legal, have also 'eroded' [its] 'underpinnings' and left it an outlier among … First Amendment cases." *Janus*, 138 S. Ct. at 2482.

a. Start with legal developments. In addition to the 2014 amendments, *see supra* Pt. II.A, intervening Supreme Court decisions have significantly undermined *Colorado II*'s already flimsy foundation. As the dissenters recognized in 2001, *Colorado II* is "an 'anomaly' in … First Amendment jurisprudence." *Janus*, 138 S. Ct. at 2483; *see Colorado II*, 533 U.S. at 474 (Thomas, J., dissenting) ("As this Court made clear just last Term, '[w]e have never accepted mere conjecture as adequate to carry a First Amendment burden.' … Today, the Court has jettisoned this evidentiary requirement."). And the gulf between *Colorado II* and other First Amendment decisions has only grown wider in the decades since.

For one thing, the *Colorado II* majority believed that preventing "undue influence on an officeholder's judgment" was sufficient to justify campaign-finance restrictions under the First Amendment and sidestepped the question whether the coordinated party expenditure limits can be justified as preventing *quid pro quo* corruption. 533 U.S. at 441, 456 n.18, 465. But the Supreme Court has since made clear that there is "only one permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance." *Cruz*, 142 S. Ct. at 1652; *accord McCutcheon*, 572 U.S. at 207 (plurality opinion); *see id.* at 239-40 (Breyer, J., dissenting) (noting that *Colorado II* applied "a considerably broader definition" of "corruption" than what current doctrine allows); *Citizens United*, 558 U.S. at 447 (Stevens, J., concurring in part and dissenting in part) (similar). The *Colorado II* majority's expansive view of corruption likely explains why it treated the fact that "substantial donations turn the parties into matchmakers whose special meetings and receptions give the donors the chance to get their points across to the candidates" as evidence of "the potential for corruption." 533 U.S. at 461. But as the Court has since made clear, "the possibility that an individual who spends large sums may garner 'influence over or access to' elected officials or political parties" does not "give rise to [the] *quid pro quo*

corruption" justifying limits on speech. *McCutcheon*, 572 U.S. at 208 (plurality opinion); *accord Cruz*, 142 S. Ct. at 1652.

In addition, the Court has since replaced the anemic version of "closely drawn" scrutiny applied in *Colorado II* with a "rigorous" form of review. *McCutcheon*, 572 U.S. at 197, 199 (plurality opinion). The *Colorado II* majority never mentioned, much less applied, a "narrow[] tailor[ing]" analysis, which is now required under "closely drawn" scrutiny. *Id.* at 209, 218; *see supra* at 25-26.

    **b.**    The Supreme Court also decided *Colorado II* against a different factual "backdrop" than the one that exists today. *Janus*, 138 S. Ct. at 2483.

For example, in 2001, the *Colorado II* majority dismissed concerns about substantial First Amendment harms on the premise that "in reality, political parties are dominant players … in federal elections." 533 U.S. at 450 (brackets omitted). That claim was dubious at the time, *see id.* at 472 n.4 (Thomas, J., dissenting), and the "experience" in the intervening 22 years "has shown otherwise," *Janus*, 138 S. Ct. at 2483; *see, e.g.*, Seib, *supra* ("'The party organizations are so damn weak,' laments Frank Fahrenkopf, former chairman of the Republican National Committee."). Today, for instance, it is "widely accepted" that the rise of "Super PACs," which "can freely receive and spend money to support specific candidates" while "operating independently of candidates and parties," "has been damaging to the political parties." Bauer, *supra*, at 899. And that harm has been exacerbated by the party expenditure limits, as these "constraints on party fundraising make Super PACs a better vehicle for channeling campaign finances." Issacharoff, *Outsourcing Politics*, *supra*, at 861. "[O]nce the interaction between party and candidate was limited by a principle of non-coordination, … there was no longer a manifest advantage" to using the party for campaigns "as opposed to buying from outside vendors." *Id.* at 864-65. Shifting power

away from the parties in turn increases polarization, as confirmed by the fact that "states that give more freedom to political parties in the campaign-finance system end up with less polarized legislatures." Richard H. Pildes, *Romanticizing Democracy, Political Fragmentation, and the Decline of American Government*, 124 Yale L.J. 804, 837 (2014).

When *Colorado II* was decided in 2001, FECA also "permit[ted] unregulated 'soft money' contributions to a party for certain activities, such as electing candidates for state office … or for voter registration and 'get out the vote' drives." *Colorado I*, 518 U.S. at 616 (plurality opinion). Congress's passage of BCRA a year later, however, "targeted soft money accumulation by the parties," further diminishing parties' power by creating an "impetus for the emergence of political funding outside the parties." Issacharoff, *Outsourcing Politics*, *supra*, at 866. Indeed, "[b]etween 2000 and 2008, [non-party] independent expenditures in the federal domain increased by at least 425%." *Id.*

"Rapid changes in technology" have further undercut *Colorado II*'s reasoning. *Citizens United*, 588 U.S. at 364. For example, the "rise of low-cost social media" has continued to erode the power of the parties as an institutional force. Samuel Issacharoff, *Democracy's Deficits*, 85 U. Chi. L. Rev. 485, 490 (2018). Conversely, technological advances have made disclosure requirements a far more effective (but less restrictive) alternative. *See McCutcheon*, 572 U.S. at 224-25 (plurality opinion); *supra* at 26-27.

**3.** Finally, "[n]o serious reliance interests are at stake" in overruling *Colorado II*. *Citizens United*, 558 U.S. at 365. To the contrary, political parties "have been prevented from acting" by being "banned from making [coordinated] expenditures" beyond FECA's limits. *Id.* And to the extent any legislature "may have enacted bans on [these] expenditures believing that those bans were constitutional," that "is not a compelling interest for *stare decisis*." *Id.*

## CONCLUSION

This Court should certify the question presented to the en banc Sixth Circuit.

May 17, 2023

Respectfully submitted,

*/s/ Thomas Conerty*
Noel J. Francisco*
Donald F. McGahn II*
John M. Gore*
E. Stewart Crosland*
Brinton Lucas*
Charles E.T. Roberts*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
njfrancisco@jonesday.com
dmcgahn@jonesday.com
jmgore@jonesday.com
scrosland@jonesday.com
blucas@jonesday.com
cetroberts@jonesday.com

T. Elliot Gaiser*
Thomas Conerty
Bar No. 101619
JONES DAY
325 John H. McConnell Boulevard
Suite 600
Columbus, OH 43215
Phone: (614) 469-3939
Fax: (614) 461-4198
egaiser@jonesday.com
tconerty@jonesday.com

*Counsel for Plaintiffs*

*Admitted pro hac vice

Jessica Furst Johnson*
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street, N.W.
Suite 643A
Washington, DC 20037
Phone: (202) 737-8808
Fax: (540) 341-8809
jessica@holtzmanvogel.com

*Counsel for National Republican
Senatorial Committee & National
Republican Congressional Committee*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 17, 2023, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system, which will send notification of this filing to all counsel of record.


*/s/ Thomas Conerty*
Thomas Conerty

*Counsel for Plaintiffs*